UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TOWN OF NEW WINDSOR,

                    Plaintiff,

vs.

UNITED STATES OF AMERICA,  STATE OF NEW
YORK, NEW YORK AIR NATIONAL GUARD, PORT
AUTHORITY OF NEW YORK AND NEW JERSEY,
NATIONAL EXPRESS LLC, AFCO AVPORTS LLC,
FEDERAL EXPRESS CORPORATION, ATLANTIC
AVIATION FBO HOLDINGS LLC THE 3M
COMPANY (f/k/a MINNESOTA MINING AND
MANUFACTURING CO.), E.I. DUPONT DE
NEMOURS & COMPANY, THE CHEMOURS
COMPANY, THE CHEMOURS COMPANY FC, LLC,
DUPONT DE NEMOURS, INC., CORTEVA, INC.,
RAYTHEON TECHNOLOGIES CORPORATION,
successor-in-interest to UNITED TECHNOLOGIES
CORPORATION, CARRIER GLOBAL
CORPORATION, UTC FIRE & SECURITY
AMERICAS CORPORATION, INC., TYCO FIRE
PRODUCTS L.P., successor-in-interest to the ANSUL
COMPANY, CHEMGUARD, INC., CHEM DESIGN
PRODUCTS, INC., KIDDE PLC INC., KIDDE-
FENWAL, INC., ANGUS INTERNATIONAL SAFETY
GROUP, LTD., ANGUS FIRE ARMOUR
CORPORATION, NATIONAL FOAM INC., CHUBB
FIRE, LTD., BUCKEYE FIRE EQUIPMENT
COMPANY, and JOHN DOES 1-10,

                    Defendants.

**COMPLAINT**

Civil Action No. _____

**TRIAL BY JURY REQUESTED**

Plaintiff **TOWN OF NEW WINDSOR** ("Town" or "Plaintiff"), by and through its

attorneys, Westervelt & Rea, LLP, for its Complaint against Defendants states as follows:

### INTRODUCTION AND NATURE OF THE ACTION

1.     Plaintiff Town of New Windsor ("Town") is a municipal supplier of drinking water,

as the owner and operator of the New Windsor Consolidated Water District that serves 30,000 of its residents and nearby water customers in Orange County, New York.

2.    The Defendants have caused the contamination of the Town's drinking water supplies with perfluoroalkyl substances and polyfluoroalkyl substances (collectively termed "per- and polyfluoroalkyl substances" or "PFAS"). These PFAS-containing aqueous film forming foams ("AFFF"), made with fluorinated chemical feedstocks, were constituents of firefighting foams used in fire training exercises and to extinguish fires at Stewart International Airport ("Airport Property") and Stewart Air National Guard Base ("Base") (collectively, "the Facilities"). This AFFF foam and its PFAS-contaminated concentrate seeped, leaked, was discharged, drained, leaked and disposed of on the ground and subsequently seeped into surface waters at the Base and at the Airport Property. These PFAS-contaminated foams were not contained, and they migrated through the environmental media at the Facilities and into the surrounding environment. These PFAS discharges from the Facilities have now contaminated the Town's drinking water supplies produced at the Butterhill Wells Treatment and Filtration Plant ("Butterhill Wells") and Kroll Well (collectively, the "Town's drinking water supplies" and "Town Property").

3.    This PFAS-containing AFFF was developed by the Defendant United States of America, acting through the United States Department of Defense ("DOD"), in consultation with Defendant 3M Company in the mid-1960s, for extinguishing liquid petroleum-based fires ("Class B Fires") that occur on military bases and on naval vessels. Since then, DOD has mandated the use of PFAS-containing AFFF at all military bases, including the Base, and at federally funded civilian airports, including the Airport.

4.    The firefighting foams discharged from the Facilities contain the PFAS compounds perfluorooctane sulfonic acid ("PFOS"), perfluorooctanoic acid ("PFOA") - including their salts,

2

ionic states. precursor chemicals, and acid forms of the molecules (collectively, "PFOA/S") - and other PFAS-containing fluorosurfactants used to make the foams' concentrates.

5.    PFAS are toxic and hazardous to health and the environment.

6.    The Owner, Operators and Lessees of the Facilities, including the United States, the State of New York, the Port Authority of New York and New Jersey, National Express LLC, AFCO Avports LLC, Federal Express Corporation, and Atlantic Aviation FBO Holdings LLC (collectively, "Owner/Operator/Lessee Defendants"), acting through their agents, employees and instrumentalities, improperly stored, discharged and disposed these contaminated foams at the Facilities for decades, discharging  thousands of gallons of AFFF and their contaminated concentrates into soils, groundwater, surface waters, floor drains, ditches and lagoons.

7.    The Owner/Operators/Lessee Defendants' discharges contaminated an off-site retention pond, Recreation Pond ("Rec Pond"), and the environment, migrating into groundwater, Kroll Well, Butterhill Wells, Silver Stream, Washington Lake Reservoir (the City of Newburgh's primary drinking water supply), and the Moodna Creek, a tributary of the Hudson River.

8.    Moreover, Defendant Operators repeatedly violated the terms of their SPDES permits, which prohibited discharges of AFFF containing PFAS into storm drains and into the sanitary sewer system. Those violations, and other acts and omissions of the Owner/Operator/Lessee Defendants resulted in the contamination of the Moodna Watershed.

9.    The Manufacturer Defendants are the companies that made, sold and/or distributed the PFAS-containing AFFF, and/or made, sold and/or distributed PFAS and fluorosurfactant feedstocks for use by other Defendant Manufacturers for use in making their AFFF products that were disposed of at the Facilities and into the environment. They include 3M Company, E.I. DuPont de Nemours and Company, the Chemours Company, the Chemours Company FC LLC, Corteva

Inc., DuPont de Nemours, Inc., Tyco Fire Products L.P., Chemguard Inc., Chem Design Products Inc., Raytheon Technologies Corporation (successor-in-interest to United Technologies Corporation), Carrier Global Corporation, UTC Fire & Security Americas Corporation, Inc., Chubb Fire, Ltd., Kidde PLC, Inc., Kidde-Fenwal, Inc., Angus International Safety Group, Ltd., Angus Fire Armour Corporation, National Foam, Inc., and Buckeye Fire Equipment Company, and all their corporate predecessors, affiliates and divisions (collectively, "Manufacturer Defendants").

10.     The Manufacturer Defendants manufactured and/or used PFOS, PFOA, and other PFAS, such as perfluorononanoic acid ("PFNA"), perfluorohexanesulfonic acid ("PFHxS"), and perfluoroheptanoic acid ("PFHpA") (and their salts, ionic states, and acid forms of the molecules), and the "precursor" chemicals that break down into PFOA, PFOS, PFNA, PFHS and PFHpA, to make AFFF containing PFAS and/or the fluorosurfactant feedstocks needed to make Mil-Spec AFFF. These products were discharged at the Facilities and into the environment. As a result, the Manufacturer Defendants' PFAS products now contaminate the Town's drinking water supplies.

11.     PFAS are synthetic chemicals that are water soluble and highly mobile once discharged into the environment, where they spread rapidly through soils, groundwater, surface water and drinking water supplies. They are extremely persistent and toxic at extremely low levels, measured in parts per trillion ("ppt").

12.     PFAS are known as "forever" chemicals because they are resistant to breakdown, before and after they are discharged into the environment. The chemical stability of PFAS means they persist for long periods and can be found long distances from where they were originally discharged into the environment. PFAS have very long half-lives, so once ingested by humans they bioaccumulate in the human body. PFAS bio-magnify in aquatic life, birds, and mammals up the food chain, to humans. PFAS exposure is linked to serious adverse health effects, including

4

kidney and testicular cancer, liver and thyroid tumors, ulcerative colitis, pregnancy-induced preeclampsia, impaired fetal development, impaired development in young children, and high cholesterol levels.

13.     The Manufacturer Defendants were fully aware of the mobility, persistence, and bioavailability of their PFAS-containing products, and the dangers they pose to health and the environment.

14.     Historic corporate documents generated by Defendant 3M Company ("3M") and Defendant E.I. DuPont de Nemours & Company ("Old DuPont") demonstrate that their own in-house toxicology and industrial medicine departments had extensively researched and documented the dangers that PFOA, PFOS and related PFAS posed to drinking water supplies, to wildlife, and to humans, including their production plant employees and thousands of other people who consumed the water that had been contaminated by their PFOA/S products and waste streams.

15.     All of the Manufacturer Defendants had expertise and understanding of the mobility, persistence and toxicity of the PFAS and the fluorochemical surfactant feedstocks contained in the AFFF that was used and released at the Facilities. They knew or should have known that, once released into the environment, these PFAS products would contaminate surrounding sources of drinking water.

16.     Despite knowing of these health and environmental threats, the Manufacturer Defendants deliberately concealed their own internal corporate research and failed to warn regulators, users, customers or the public of these dangers. They failed to instruct their customers and users of the need and/or method by which their PFAS products needed to be stored, contained and disposed of, in order to protect against, avoid and prevent the known adverse health effects and consequences to the environment, including contamination of public drinking water. Instead, the

Manufacturer Defendants touted the "safety" of their PFAS products that they reasonably knew would end up in drinking water.

17.    As a result of their intentional and/or negligent failure to warn regulators, customers, users and the public of the known dangers of PFAS and the fluorosurfactant feedstocks contained in their AFFF products, these toxic, defectively designed products now contaminate the Facilities and the environment, including the Watershed and the Town's drinking water supplies.

18.    The term "Watershed" as used in this Complaint means the affected areas between, in and around the Base, the Airport Property, and the waters, streams, and tributaries that drain them into the Hudson River, primarily within the Moodna Watershed. The "Watershed" includes, among other features, Rec Pond, Brown's Pond, Kroll Well, Silver Stream (above and below its Diversion Gate near Washington Lake), Moodna Creek, all their  impoundments and tributaries, and groundwater that sources the Kroll Well and Butterhill Wells wellfields.

19.    In this action, the Town seeks injunctive relief ordering Defendants to abate this public nuisance they have caused, by fully remediating and restoring the Butterhill Wells and Kroll Well drinking water supplies; and an order requiring Defendants to immediately remediate the Facilities to prevent further releases of contamination. The Town also seeks compensatory and consequential damages for past and future costs it has incurred and will incur due to contamination of the Butterhill Wells, including but not limited to: the purchase of replacement drinking water supplies; lost revenues; past and future interest and bond repayment costs related to development and construction of the Butterhill Wells (until the contamination is remediated in full); payment of all the Town's environmental consulting and legal fees/expenses related thereto; all necessary costs of response; restitution in full; indemnification; and punitive damages against the Manufacturing Defendants for their intentional manufacture of defective products and their reckless and wanton

6

failure to warn of the dangers inherent in these defective products, all of which has endangered the health and welfare of the Town, its residents, its water customers and consumers, and the public in general.

20.     Two related cases have been filed by the City of Newburgh, *City of Newburgh v. United States of America, et al.*, and the State of New York, *State of New York v. 3M Company, et al.* On December 18, 2018, these cases and approximately 77 other AFFF cases pending across the Country were transferred by the Judicial Panel for Multidistrict Litigation ("MDL Panel") to the United States District Court for the District of South Carolina, for discovery and pretrial proceedings under the supervision of United States District Judge Richard Gergel, in MDL No. 2873, *In Re: Aqueous Film Forming Foams Products Liability Litigation.* Additional AFFF cases have also since been transferred. Upon information and belief, this case may be subject to the December 18, 2018 MDL order and transfer by the MDL Panel.

## THE PARTIES

21.     **Plaintiff Town of New Windsor** is a municipal corporation organized under the laws of the State of New York, with offices at 555 Union Avenue, New Windsor, New York 12553.

## A.    DEFENDANT OWNER, OPERATORS, AND LESSEES OF THE FACILITIES

22.     **Defendant United States of America** maintains offices at the Office of the President of the United States, at the White House, 1600 Pennsylvania Avenue, Washington, D.C. The Department of Defense ("DOD") is an executive department of the federal government of the United States, with headquarters at the Pentagon, Washington, D.C. 20301. The United States Air Force ("Air Force" and "USAF") is a branch of the DOD. The United States Air National Guard ("USANG") is a division of the National Guard Bureau and also a bureau of the Air Force. The United States Marine Corps Reserve (USMCR) is the reserve force of the United States Marine

7

Corps, a branch of the DOD.

23.    The Air Force, along with the New York Air National Guard ("NYANG"), is the current operator of the ANG Base. Upon information and belief, the USMCR also conducted operations on the ANG Base.

24.    During the course of their operations, the Air Force and USMCR, acting through their agents, employees and instrumentalities, negligently conducted and/or allowed the improper storage, handling, discharge and/or disposal of AFFF containing PFAS at the ANG Base and into the environment, which resulted in PFAS contamination of the Town's drinking water supplies. DOD, USANG, and the Air Force are collectively referred to in this Complaint as "DOD."

25.    **Defendant State of New York** ("State") is a state with offices at the New York State Capitol Building, State Street and Washington Avenue, Albany, New York 12224. The New York State Department of Transportation ("NYSDOT") is an agency of the State with offices at 50 Wolf Road, Albany, New York 12232.

26.    The State, through NYSDOT, is the owner of both the Base and the Airport Property. The State, through NYANG, is an Operator of the Base. The State, acting through its agents, employees and instrumentalities, negligently stored, handled, discharged and/or disposed of AFFF containing PFAS at and from the Base, and/or allowed others under their control to improperly store, handle, discharge, and dispose of Mil-Spec AFFF at the Facilities and into the environment, resulting in PFAS contamination of the Watershed and the Town's drinking water supplies.

27.    **Defendant New York Air National Guard** ("NYANG") is the Air Force militia of the State, with offices at 330 Old Niskayuna Road, Latham, New York 12110. Upon information and belief, NYANG is under the jurisdiction of the Governor of the State. As noted above, the NYANG, along with the Air Force, is the current operator of the ANG Base.

8

28. During the course of operations, the Air Force and USMCR, acting through their agents, employees and instrumentalities, negligently conducted and/or allowed the improper storage, handling, discharge and/or disposal of AFFF containing PFAS at the Base and into the environment, resulting in PFAS contamination of the Watershed and the Town's drinking water supplies.

29. Upon information and belief, other State agencies or instrumentalities may have also participated and/or negligently allowed the improper storage, handling, discharge and/or disposal of AFFF containing PFAS at or around the Base and into the environment, resulting in PFAS contamination of the Watershed and the Town's drinking water supplies.

30. Collectively, the State, NYANG, and NYSDOT are referred to in this Complaint as "State."

31. **Defendant Port Authority of New York and New Jersey** ("PANYNJ") is a bi-state public benefit corporation with offices at 4 World Trade Center, 150 Greenwich Street, New York, New York 10007.

32. Upon information and belief, the PANYNJ is an operator of the Airport Property. During the course of its operations, the PANYNJ, acting through its agents, employees and instrumentalities, negligently conducted and/or allowed the improper storage, handling, discharge, and/or disposal of AFFF containing PFAS at the Airport Property and into the environment, resulting in PFAS contamination of the Watershed and the Town's drinking water supplies.

33. **Defendant National Express LLC** ("National Express") is a Delaware limited liability company with a principal place of business at 2601 Navistar Drive, Lisle, Illinois 60532.

34. Upon information and belief, National Express is the successor of SWF Airport Acquisition, Inc. ("SWF"), former lessee and operator of the Airport Property.

35.    Upon information and belief, during the course of its operations, National Express and its predecessors, acting through their agents, employees and instrumentalities, negligently conducted and/or allowed the improper storage, handling, discharge and/or disposal of AFFF containing PFAS at the Airport Property and into the environment, resulting in PFAS contamination of the Watershed and the Town's drinking water supplies.

36.    **Defendant AFCO Avports Management LLC** ("Avports") is a Delaware limited liability company, with a principal place of business at 45025 Aviation Drive, Suite 100, Dulles International Airport, Dulles, Virginia 20166.

37.    Upon information and belief, Avports is a current operator and lessee of the Airport Property, having succeeded to the lease previously held by National Express.

38.    Upon information and belief, during the course of its operations, Avports and its predecessor lessees and operators, acting through their agents, employees and instrumentalities, negligently conducted and/or allowed improper storage, handling, discharge and/or disposal of AFFF containing PFAS at the Airport Property and into the environment, resulting in PFAS contamination of the Watershed and the Town's drinking water supplies.

39.    **Defendant Federal Express Corporation** ("FedEx") is a Delaware corporation with a principal place of business at 3610 Hacks Cross Road, Memphis, Tennessee 38120.

40.    Upon information and belief, FedEx is a lessee of the Airport and conducts or has conducted business at the Airport Property.

41.    On September 5, 2005, a jet operated by or on behalf of FedEx caught fire in midair and landed at the Airport so the fire could be extinguished. This resulted in thousands of gallons of AFFF containing PFAS to flow, uncontained into the environment. Defendant FedEx was negligent in causing and/or allowing the improper discharge and/or disposal of the AFFF containing

PFAS used to extinguish the fire, which thereafter resulted in contamination of the Watershed and the Town's drinking water supplies.

42.    **Defendant Atlantic Aviation FBO Holdings LLC** ("Atlantic Aviation") is a Delaware limited liability company with a principal place of business at 5201 Tennyson Parkway, Suite 150, Plano, Texas 75024.

43.    Upon information and belief, Atlantic Aviation is a lessee of and currently conducts operations at the Airport Property. On April 13, 2019, a major spill of AFFF containing PFAS was discharged from the Atlantic Aviation hangar at the Airport and disposed of into the environment, where it entered Silver Stream and the Moodna Creek. This negligent handling of AFFF containing PFAS by Defendant Atlantic Aviation resulted in contamination of the Watershed and the Town's drinking water supplies.

44.    Upon information and belief, all of the Owner/Operator/Lessee Defendants, acting through their agents, employees, and instrumentalities, negligently conducted, caused, and/or allowed the improper storage, handling, discharge and/or disposal of AFFF containing PFAS at and/or from the Facilities and into the environment, where they now contaminate the Watershed and the Town's drinking water supplies.

## B.    DEFENDANT MANUFACTURERS

45.    **Defendant The 3M Company ("3M")** (f/k/a Minnesota Mining and Manufacturing Co.) is a Delaware corporation with a principal place of business at 3M Center, St. Paul, Minnesota 55144.

46.    Upon information and belief, 3M designed, manufactured, marketed, and/or sold the AFFF containing PFAS that was used, stored, discharged and/or disposed of at the Facilities and into the environment, and which now contaminates the Watershed and the Town's drinking water

11

supplies.

47.    Upon information and belief, until approximately 2002, 3M also manufactured, marketed and/or sold PFOS and PFOA chemicals to some or all of the other Defendant Manufacturers, who used these chemicals to make the AFFF used, stored, discharged and/or disposed of at the Facilities. As a result, these chemicals now contaminate the Watershed and the Town's drinking water supplies.

48.    **Defendant E.I. DuPont de Nemours and Company** ("Old DuPont") is a Delaware corporation with a principal place of business at 974 Centre Road, Wilmington, Delaware 19805.

49.    Upon information and belief, beginning in or around 2000, Old DuPont and its subsidiaries, affiliates, divisions and successors designed, manufactured, marketed and/or sold PFOA and other fluorosurfactant feedstocks used by some or all of the other Manufacturer Defendants to make the AFFF that was used, stored, discharged and/or disposed of at the Facilities and into the environment. As a result, Old DuPont's PFOA and/or other fluorosurfactants now contaminate the Watershed and the Town's drinking water supplies.

50.    **Defendant the Chemours Company** ("Chemours") is a Delaware corporation with a principal place of business at 1007 Market Street, Wilmington, Delaware 19889.

51.    Upon information and belief, Chemours was a wholly owned subsidiary of Old DuPont until it was spun off by Old DuPont in 2015 and made into a publicly traded corporation in order to limit Old DuPont's PFAS liability.

52.    Upon information and belief, Chemours, its corporate affiliates, subsidiaries, divisions and predecessors (including Old DuPont) designed, manufactured, marketed and/or sold PFOA and other fluorosurfactant feedstocks used by some or all of the other Manufacturer Defendants to make the AFFF containing PFAS that was used, stored, discharged and/or disposed

12

of at the Facilities and into the environment. As a result, Chemours' PFOA and/or fluorosurfactant feedstocks now contaminate the Watershed and the Town's drinking water supplies.

53.    **Defendant the Chemours Company FC LLC** ("Chemours FC") is a Delaware limited liability corporation with a principal place of business at 1007 Market Street, Wilmington, Delaware 19899.

54.    Upon information and belief, Chemours FC is a successor-in-interest to DuPont Chemical Solutions, a subsidiary of Old DuPont that operated its performance chemicals business.

55.    Chemours FC and its predecessors, subsidiaries, divisions and/or and affiliates (including Old DuPont) designed, manufactured, marketed and Upon information and belief, /or sold PFOA and fluorosurfactant feedstocks to some or all of the other Manufacturers for their use in making AFFF containing PFAS, which was then used, stored, discharged and/or disposed of at the Facilities and into the environment. Chemours FC's PFOA and/or fluorosurfactants now contaminate the Watershed and the Town's drinking water supplies.

56.    Upon information and belief, the reason for Old DuPont's 2015 spin-off of Chemours was because by 2015, Old DuPont had been sued in multiple governmental and private party class action lawsuits, and it expected that hundreds more mass tort cases would be filed across the country as more people discovered illness and injury caused by exposure to Old DuPont's PFAS products.

57.    Anticipating enormous PFAS liabilities (which would include three jury verdicts awarding $19.7M in compensatory and punitive damages to former DuPont employees suffering from cancer; a class action settlement of $343M; and the funding of a multi-million dollar independent science panel, called the "C8 Panel," to determine to health effects of exposure and determine DuPont's liability; another class action settlement of $671M; an EPA civil penalty of

13

$16.5M, and scores of other class actions, mass tort cases, and suits by municipal water suppliers whose drinking water had been contaminated by Old DuPont's products), Old DuPont hatched a scheme to offload its financial responsibility for PFAS onto the back of Chemours, its corporate subsidiary.

58.    In 2015, Old DuPont spun off Chemours into an independent, publicly traded company. Pursuant to a separation agreement dated June 26, 2015 (hereinafter "Old Dupont-Chemours Separation Agreement"), Old DuPont required Chemours to assume Old DuPont's PFOA/S liabilities. After the spin-off, Chemours continued to make, market and/or sell PFOA and/or fluorosurfactant feedstocks to others for their manufacture of AFFF. Upon information and belief, this PFOA and/or fluorosurfactant was used in AFFF containing PFAS, which was used, stored, discharged and/or disposed of at the Facilities and in the environment, and now contaminates the Watershed and the Town's drinking water supplies. In August 2017, Old DuPont merged with the Dow Chemical Company to become DowDuPont Inc. ("DowDuPont").

59.    In 2019, DowDuPont separated into three publicly traded companies, which were to operate separately in the agriculture, materials science, and specialty products space. Upon information and belief, this separation was governed by an April 2019 separation agreement, later modified by a June 2019 letter agreement. For purpose of this Complaint, these two agreements will collectively be referred to as the "DowDuPont Separation Agreement."

60.    **Defendant Corteva, Inc.** ("Corteva") is a Delaware corporation with a principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

61.    Upon information and belief, Corteva is one of the three companies spun off pursuant to the DowDupont Separation Agreement. Corteva assumed DowDuPont's agriculture business.

14

62.    Upon information and belief, pursuant to the terms of the DowDupont Separation Agreement, Corteva also assumed all or a portion of Old DuPont's perfluorinated chemicals liabilities, including its PFOA/S liabilities.  Pursuant to the DowDuPont Separation Agreement, Corteva became and remains the direct parent company of Old DuPont.

63.    **Defendant DuPont de Nemours, Inc.** ("New DuPont") is a Delaware corporation with a principal place of business at 974 Centre Road, Building 730, Wilmington, Delaware 19805.

64.    Upon information and belief, pursuant to the DowDupont Separation Agreement, New DuPont assumed DowDuPont's specialty products business.

65.    Upon information and belief, pursuant to the DowDuPont Separation Agreement, New DuPont also assumed all or a portion of Old DuPont's perfluorinated chemicals liabilities, including its PFOA/S liabilities.

66.    Upon information and belief, Old DuPont, New DuPont, Corteva and Chemours have either: (1) designed, manufactured, marketed, and/or sold PFOA and/or fluorosurfactant feedstocks to some or all of the Defendant Manufacturers, who used those feedstocks in their AFFF Products, which were used, stored, discharged and/or disposed of at the Facilities and into the environment, and which now contaminate the Watershed and the Town's drinking water supplies; or (2) assumed and/or succeeded Old DuPont's liabilities for its performance chemicals business, including its PFOA/S liabilities for the same.

67.    **Defendant Tyco Fire Products L.P.** ("Tyco") is a Delaware limited partnership with a principal place of business at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446.

68.    Upon information and belief, Tyco is a subsidiary of Johnson Controls International, PLC.

69.    Upon information and belief, Tyco is the successor-in-interest to The Ansul

15

Company ("Ansul"), which since 1975, had designed, manufactured, marketed, and/or sold AFFF containing PFAS. After Tyco acquired Ansul in 1990, it continued making the Tyco/Ansul brand of AFFF containing PFAS, which was used, stored, discharged and/or disposed of at the Facilities and into the environment, and which now contaminates the Watershed and the Town's drinking water supplies.

70.     Upon information and belief, Tyco acquired Chemguard, Inc. in 2011.

71.     **Defendant Chemguard, Inc**. ("Chemguard") is a Wisconsin corporation with a principal place of business at One Stanton Street, Marinette, Wisconsin 54143-2542.

72.     Upon information and belief, Chemguard is a subsidiary of Johnson Controls International PLC.

73.     Upon information and belief, Chemguard developed, designed, manufactured, marketed, sold, and/or distributed AFFF containing PFAS that was used, stored, discharged and/or disposed of at the Facilities and into the environment, and which now contaminates the Watershed and the Town's drinking water supplies.

74.     Moreover, Chemguard also designed, manufactured, marketed, and/or sold fluorosurfactant feedstocks to some or all of the Manufacturer Defendants, who used them in the AFFF containing PFAS, which was used, stored, discharged and/or disposed of at the Facilities and into the environment. As a result, Chemguard's fluorosurfactants now contaminate the Watershed and the Town's drinking water supplies.

75.     **Defendant Chem Design Products, Inc**. ("Chem Design") is a Texas corporation with a principal place of business located at Two Stanton Street, Marinette, Wisconsin 54143.

76.     Upon information and belief, Chem Design is a subsidiary of Johnson Controls International, PLC.

16

77.    Upon information and belief, Chem Design designed, manufactured, marketed, and/or sold fluorinated surfactant feedstocks to some or all of the Manufacturer Defendants, who used them in the AFFF that was used, stored, discharged and/or disposed of at the Facilities and into the environment. As a result, Chem Design's fluoro chemical surfactants now contaminate the Watershed and the Town's drinking water supplies.

78.    **Defendant Raytheon Technologies Corporation (f/k/a United Technologies Corporation)** ("Raytheon f/k/a United Technologies") is a Delaware corporation with a principal place of business located at 10 Farm Springs Road, Farmington, Connecticut 06032.

79.    Upon information and belief, Raytheon acquired United Technologies Corporation by merger in or around April 2020.

80.    Upon information and belief, Raytheon's predecessor United Technologies Corporation and its predecessors, affiliates, divisions and subsidiaries developed, designed, manufactured, marketed, sold, and/or distributed AFFF containing PFAS that was used, stored, discharged and/or disposed of at the Facilities and into the environment, and which now contaminate the Watershed and the Town's drinking water supplies.

81.    **Defendant Carrier Global Corporation** ("Carrier") is a Delaware corporation with a principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092.

82.    Upon information and belief, Carrier was acquired by United Technologies Corporation in or around 2013 and combined with other units to form the subsidiary UTC Building and Industrial Systems. In 2020, Carrier was separated and spun off from United Technologies Corporation and became an independent company. Upon information and belief, Carrier's predecessors, subsidiaries, affiliates and divisions developed, designed, manufactured, marketed, sold, and/or distributed AFFF containing PFAS, which was used, stored, discharged and/or

17

disposed at the Facilities and into the environment, and which now contaminates the Watershed and the Town's drinking water supplies.

83.     **Defendant UTC Fire & Security Americas Corporation, Inc.** ("UTC") is a Delaware Corporation with a principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

84.     Upon information and belief, UTC was a division of United Technologies Corporation. Upon information and belief, UTC acquired Kidde, PLLC,   UTC remained a part of Carrier after it was separated and spun off from United Technologies Corporation in 2020.

85.     Upon information and belief, UTC and/or its predecessors, successors, affiliates subsidiaries and/or divisions developed, designed, manufactured, marketed, sold, and/or distributed AFFF containing PFAS, which that was used, stored, discharged and/or disposed of at the Facilities and into the environment.  As a result, UTC's AFFF containing PFAS now contaminates the Watershed and the Town's drinking water supplies.

86.     **Defendant Chubb Fire, Ltd.** ("Chubb") is a foreign private limited company, authorized to do business in New York through its parent company, Carrier. It maintains offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ and, upon information and belief, is registered in England with a registration number of 524469.

87.     Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb/National Foam, Inc.  Upon information and belief, Chubb was part of UTC Fire & Security Americas Corporation Inc., and Kidde, PLLC.

88.     Upon information and belief, Chubb and/or its predecessors, affiliates, subsidiaries

18

and/or divisions developed, designed, manufactured, marketed, sold, and/or distributed AFFF that was used, stored, discharged and/or disposed of at the Facilities and into the environment, and which now contaminates the Watershed and the Town's drinking water supplies.

89.    **Defendant Kidde PLC Inc.** ("Kidde PLC") is a Delaware corporation with a principal place of business located at One Carrier Place, Farmington, Connecticut 06034. Upon information and belief, Kidde PLC was part of UTC Fire & Security Americas Corporation, Inc. formerly known as Williams Holdings, Inc. and/or Williams US, Inc.

90.    Upon information and belief, Kidde and its predecessors, affiliates and/or subsidiaries developed, designed, manufactured, marketed, sold, and/or distributed AFFF containing PFAS, which was used and disposed at the Facilities and into the environment, and which now contaminates the Watershed and the Town's drinking water supplies.

91.    **Defendant Kidde-Fenwal, Inc**. ("Kidde-Fenwal") is a Delaware corporation with principal offices at One Financial Plaza, Hartford, Connecticut 06101.

92.    Upon information and belief, Kidde-Fenwal was created in 1966 after Kenwal, Inc. was acquired by Walter Kidde & Company. After numerous other corporate mergers, acquisitions and restructurings, Kidde-Fenwal became part of Carrier in 2020. Kidde-Fenwal is the successor-in-interest of Kidde Fire Fighting, Inc. which was formerly known as or affiliated with National Foam, Inc., National Foam Systems, Inc., and/or Chubb National Foam, Inc.

93.    Upon information and belief, Kidde-Fenwal and its predecessors, affiliates, subsidiaries and/or divisions developed, designed, manufactured, marketed, sold, and/or distributed AFFF containing PFAS, which was used, stored, discharged and/or disposed of at the Facilities and into the environment. As a result, Kidde-Fenwal's AFFF containing PFAS now contaminates the Watershed and the Town's drinking water supplies.

94.    **Defendant Angus International Safety Group, Ltd**. ("Angus International") is a foreign private liability company, with offices at Station Road, High Bentham, Lancaster, LA2 7NA, United Kingdom. Upon information and belief, Angus International is registered in England with a registration number of 08441763.

95.    Upon information and belief, Angus International and its affiliates and subsidiaries developed, designed, manufactured, marketed, sold, and/or distributed AFFF containing PFAS, which was used, stored, discharged and disposed of at the Facilities into the environment. As a result, Angus International's AFFF containing PFAS now contaminates the Watershed and the Town's drinking water supplies.

96.    **Defendant Angus Fire Armour Corporation** ("Angus Fire") is a Delaware corporation with a principal place of business at 141 Junny Road, Angier, North Carolina 27501.

97.    Upon information and belief, Angus Fire and its predecessors, affiliates, divisions and/or subsidiaries, including but not limited to National Foam, Inc. and/or Chubb/National Foam, Inc. developed, designed, manufactured, marketed, sold, and distributed AFFF containing PFAS that was used and disposed of at the Facilities into the environment, that now contaminates the Town's drinking water supplies.

98.    **Defendant National Foam, Inc.** ("National Foam") is a Delaware corporation with a principal place of business at 141 Junny Road, Angier, North Carolina 27501.

99.    Upon information and belief, National Foam is a subsidiary of Defendant Angus International Safety Group, successor-in-interest to Defendant Angus Fire. Upon information and belief National Foam manufactures the Angus Brand of AFFF.

100.    Upon information and belief, National Foam and/or Chubb/National Foam, its predecessors, affiliates, subsidiaries and/or divisions developed, designed, manufactured,

marketed, sold, and/or distributed AFFF containing PFAS, which was used, stored, discharged and/or disposed of at the Facilities into the environment. As a result, National Foam's AFFF containing PFAS now contaminates the Watershed and the Town's drinking water supplies.

101.    **Defendant Buckeye Fire Equipment Company** ("Buckeye") is an Ohio with a principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

102.    Upon information and belief, Buckeye developed, designed, manufactured, marketed, sold and/or distributed AFFF containing PFAS, which was used, stored, discharged and/or disposed of at the Facilities and into the environment. As a result, Buckeye's AFFF containing PFAS now contaminates the Watershed and the Town's drinking water supplies.

103.    Defendants John Does 1-10 are other persons that may be responsible for and share liability for the contamination of the Watershed and the Town's drinking water supplies, which have yet to be identified.


## JURISDICTION, VENUE AND EXHAUSTION OF ADMINISTRATIVE REMEDIES

104.    This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §1331, because this case arises under the laws of the United States of America; the First Cause of Action is predicated upon and seeks relief under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") 42 U.S.C. §9601 *et seq.* and CERCLA §113.

105.    This Court also has jurisdiction pursuant to 28 U.S.C. §1346.

106.    Plaintiff brings its negligence claims against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§2671-2680. This Court has jurisdiction over those claims under the FTCA, pursuant to 28 U.S.C. §1346.

107.   Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over the claims arising under New York State law set forth in the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Causes of Action, which are so related to the federal question claims that they form part of the same case or controversy.

108.   The Declaratory Judgments Act, 28 U.S.C. §2201, authorizes this Court to grant declaratory relief in this matter.

109.   Venue is proper in the Southern District of New York pursuant to CERCLA §113(b), 42 U.S.C. §9613(b), because the discharges and releases occurred within the Southern District of New York, and pursuant to 28 U.S.C. §1391(b)(2); because the Airport Property, the Base Property, the Watershed, and Butterhill Wells are located within the Southern District of New York; and because the events related to the claims in this Complaint caused the damages to the Town's property within the Southern District of New York.

110.   The United States has waived its sovereign immunity pursuant to CERCLA §120(a)(1), 42 U.S.C. §9601(a)(1), and under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§2671-2680.

111.   The Town exhausted its administrative remedies against the United States under the FTCA when, on March 19, 2020, it submitted the required Notices of Claim (Form 95), which it supplemented on April 16, 2020, claiming damages in the amount of $4,614.808 as of April 16, 2020 for expenses related to contamination of the Butterhill Wells. The Department of the Air Force denied the Town's claims by letter dated November 4, 2020. Thus, this action was timely filed and is ready for adjudication by this Court.

112.   Since then, the Town has incurred significant costs buying replacement Catskill Aqueduct water from the New York City Department of Environmental Protection ("NYCDEP").

For the period of May 2019 through October 2020, the NYCDEP has billed the Town $1,631,820.81, not including accruing interest. The Town has incurred other costs and expenses proximately caused by the negligence of the United States, and it will continue to incur future costs and expenses until the Butterhill Wells are remediated and restored.

113.    The Town hereby reserves its rights to seek all costs and expenses incurred for replacement water supplies and all other past and future costs and expenses it will incur in connection with remediation of the contamination.

114.    The Town is not required to file a notice of intention to file a claim with respect to tort claims against the State or PANYNJ because this Complaint seeks injunctive relief and incidental damages, and/or because it is brought to vindicate the public interest.

115.    Furthermore, some or all of the claims set forth in this Complaint arise out of continuing wrongs.

## BACKGROUND AND ADDITIONAL FACTS COMMON TO ALL CLAIMS

### A.    THE CONTAMINANTS: PER – AND POLYFLUOROALKYL SUBSTANCES ("PFAS")

116.    PFAS are synthetic, manufactured chemical compounds that do not occur naturally in the environment, humans or animals.

117.    PFAS were initially developed during the Manhattan Project in the 1940sAfter World War II, 3M developed several PFAS and other fluorochemical surfactants for commercial use.

118.    3M synthesized these PFAS compounds by using a patented electrochemical fluorination process to bind fluorine atoms to carbon atoms.

119.    Some of the PFAS manufactured by 3M include PFOA, PFOS, PFNA, PFHxS, PFHpA and their precursors, which can transform into other PFAS.

23

120.    PFAS and other fluorosurfactants were later made by other manufacturers using a telomerization process.

121.    The carbon-fluorine bond is one of the strongest chemical bonds ever created, which is why these molecules are so stable and persistent in the environment.

122.    PFOA and PFOS are two PFAS that have eight carbon-fluorine bonds and have been referred to as "C8."

123.    PFAS have strong surfactant properties.

124.    Having strong surfactant properties means they reduce the surface tension between a liquid and another liquid or solid. This makes these fluorochemical surfactants highly effective in manufacturing products which require fire resistance, such as AFFF.

125.    These fluorochemical surfactants are also very effective in the manufacture of oil-, stain-, grease-, and water-repellent fabrics, textiles, and coatings for non-stick cookware, carpets, paper, leather, paint, and myriad other consumer products.[1]

126.    When PFOA/S (and related PFAS) are discharged into the environment, they are highly water soluble, which increases the rate at which they spread and migrate through surrounding soils, groundwater, and surface waters, including drinking water.

127.    Their mobility is made more dangerous by their persistence in the environment and their resistance to biologic, environmental, or photochemical degradation.[2]

128.    The properties that make PFOA/S so useful in manufacturing also makes them virtually indestructible when they are discharged into the environment.

---

[1] *See* U.S. EPA, Per- and Polyfluoroalkyl Substances (PFASs) under TSCA, retrieved from https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/and-polyfluoroalkyl-substances-pfass-under-tsca (Last visited Feb. 18, 2021).
[2] *See* EPA, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R-16-005 (May 2016) at 16; and Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS), EPA Document Number: 822-R-16-004 (May 2016) at 16, both available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

129.    They are persistent and do not degrade or break down (other than by transforming into other PFAS), which is why they are called "forever chemicals."

130.    PFOA and PFOS are persistent in the human body. A short-term exposure can result in lasting contamination that persists for years, and which increases with each additional exposure.[3]

131.    PFOA/S and related PFAS are readily absorbed in animal and human tissues after exposure, where they bind to blood albumin, then circulate freely and accumulate in the kidneys, liver, testes and/or digestive organs. PFOA/S have been found globally in water, soil, and air, as well as in human food supplies, human blood serum, and breast milk.[4]

132.    Virtually all human babies worldwide are now born with PFAS-tainted blood, because their persistence and bioaccumulation in the human body, PFAS contaminants pass through the placental barrier of the mother during pregnancy and are found in umbilical cord blood.

133.    PFAS continues to accumulate in babies who are breast-fed, and those who consume food and water containing PFAS.

134.    PFAS exposure is strongly linked to life-threatening health effects.

135.    According to the United States Environmental Protection Agency ("EPA"), "…studies indicate that exposure to PFOA and PFOS above certain levels may result in…developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)." [5]

---

[3] See EPA Document Number: 822-R-16-004 (May 2016) at 55; and EPA Document Number: 822-R-16-004 (May 2016) at 55.
[4] See EPA Document Number: 822-R-16-005 (May 2016) at 18-20, 25-27; and EPA Document Number: 822-R-16-004 (May 2016) at 19-21, 26, 28.
[5] See "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

136.    The EPA has also warned that "there is suggestive evidence of carcinogenic potential for PFOS."[6]

137.    The EPA has noted that "drinking water can be an additional source [of PFOA/PFOS in the body] in the small percentage of communities where these chemicals have contaminated water supplies." In communities with contaminated water supplies, "such contamination is typically localized and associated with a specific facility, for example…an airfield at which [PFOA/PFOS] were used for firefighting."[7]  New Windsor is one of those localized communities whose drinking water was contaminated by releases from the Base and Airport Property.

138.    Upon information and belief, there have been thousands of perfluorinated chemicals and PFAS manufactured, distributed, and sold in the United States. Many have yet to be identified by the EPA.

139.    To date, the NYSDEC analyzes sediment, surface water, groundwater, soil and, if necessary, animals and biota for only 21 out of all the known PFAS compounds.  The 21 compounds currently tested for include:

|  |
| --- |
| Perfluorobutanoic acid ("PFBA") |
| Perfluoropentanoic acid ("PFPeA") |
| Perfluorohexanoic acid ("PFHxA") |
| Perfluoroheptanoic acid ("PFHpA") |
| Perfluorooctanoic acid ("PFOA") |
| Perfluorononanoic acid ("PFNA") |
| Perfluorodecanoic acid ("PFDA") |
| Perfluoroundecanoic acid ("PFUnA") |
| Perfluorododecanoic acid ("PFDoA") |

[6] See "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)" U.S. Environmental Protection Agency Office of Water Health and Ecological Criteria Division, EPA Document Number: 822-R-16-002, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.
[7] See "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

| |
|---|
| Perfluorotridecanoic acid ("PFTriA") |
| Perfluorotetradecanoic acid ("PFTeA") |
| Perfluorobutanesulfonic acid ("PFBS") |
| Perfluorohexanesulfonic acid ("PFHxS") |
| Perfluoroheptanesulfonic acid ("PFHpS") |
| Perfluorooctanesulfonic acid ("PFOS") |
| Perfluorodecanesulfonic acid ("PFDS") |
| Perfluorooctane Sulfonamide ("FOSA") |
| N-methyl perfluorooctane sulfonamidoacetic acid ("NMeFOSAA") |
| N-ethyl perfluorooctane sulfonamidoacetic acid ("NEtFOSAA") |
| 6:2 Fluorotelomer sulfonate ("6:2FTS") |
| 8:2 Fluorotelomer sulfonate ("8:2FTS") |

140.    Upon information and belief, the NYSDEC is in the process of expanding this list of PFAS compounds.

141.    The two most widely known and studied PFAS are PFOA and PFOS, which are considered "Long Chain" compounds.

142.    Upon information and belief, "Shorter Chain" PFAS compounds are now being used as the fluorosurfactants in consumer products and in Mil-Spec AFFF. Several of these shorter chain PFAS compounds also pose health risks.

**B. MIL-SPEC AFFF**

143.    Aqueous film forming foam ("AFFF") containing PFAS is a type of water-based foam that was first developed by 3M during the 1960s.

144.    In collaboration with 3M, DOD sought development of a firefighting foam formulation that would be effective in extinguishing liquid fuel-based fires ("Class B fires") at

military bases, airports and on naval vessels.[8] 3M recommended including fluorocarbon surfactants (which only 3M manufactured) in the formulation of the concentrates to be used in the AFFF.

145.    In 1966, DOD received a patent for and issued military specification MIL-F-24385, outlining military performance specifications necessary for AFFF products that could qualify to be included on its "Qualified Products List" ("QPL"). Thus, DOD mandated that only AFFF brands listed on the QPL could be used at military installations for training and fire suppression.

146.    MIL-F-24385 specified an AFFF concentrate that "consists of fluorocarbon surfactants plus other compounds…." but it contains no further requirements concerning these fluorocarbon surfactants, such as length of the fluorine-carbon chain that AFFF manufacturers could use.

147.    The AFFF Mil-Spec also states that "[t]he material shall have no adverse effect on the health of personnel when used for its intended purpose." The current, amended version of the specification still contains this language.

148.    MIL-F-24385 also specified that AFFF liquid concentrate could contain either 3% or 6% fluorinated surfactant, with 3% AFFF concentrate referred to as "Type 3" and 6% AFFF concentrate referred to as "Type 6."

149.    In the foam industry, concentrates are typically referred to as "3%" or "6%" concentrate, depending on the mixture rate with water, either 97% or 94% respectively.

150.    At the Base and at the Airport Property, the Manufacturing Defendants' Mil-Spec AFFF concentrate containing PFAS (and/or their fluorochemical surfactant feedstocks) were stored in above-ground storage tanks, underground storage tanks, and non-stationary containers.

---

[8] *See* Remediation and Reuse Focus Group Federal Facilities Research Center, "Perfluorinated Chemicals (PFAS): Perfluorooctanoic Acid (PFOA) & Perfluorooctane Sulfonate (PFOS) Information Paper," dated August 2015, retrieved from https://clu-in.org/download/contaminantfocus/pops/POPs-ASTSWMO-PFCs-2015.pdf (last visited Feb. 18, 2021).

151.    To make the finished firefighting foam, the Operator/Lessee Defendants mixed the Mil-Spec AFFF concentrate with water to make the liquid foam solution. This solution was then aerated at the nozzle, producing the finished foam to apply to the fire.[9]

152.    The AFFF coats the fire, blocking the supply of oxygen feeding the fire and creating a barrier to extinguish the petroleum vapors that feed the fire. A film also forms to smother the fire after the foam has dissipated back into a PFAS concentrate that also contains burned hydrocarbon residues from the extinguished fire.

153.    Thousands of gallons of foam solution may be applied during a single release or discharge of AFFF.

154.    AFFF containing PFAS has been released and disposed of at and on the Base and Airport, and into the environment for decades. These releases occurred in several ways, including:

- low volume releases of foam concentrate during storage, transfer, or equipment calibration.
- high volume discharge of foam solution for apparatus testing.
- occasional, high-volume, broadcast discharge of foam solution for firefighting and fire suppression/prevention.
- periodic, high volume, broadcast discharge for fire training.
- leaks from foam distribution piping between storage and pumping locations; and
- inadvertent releases through fire suppression systems in hangars and other structures located at the Airport and the Base. [10]

155.    If it is not contained, the AFFF reverts from foam to the liquid solution of PFAS and water, and after release, that concentrate, and residual hydrocarbon waste accumulates and leaches into soils, sediments, and surface waters; it enters storm and sanitary sewers; and it infiltrates into groundwater.

---

[9] *See* Interstate Technical & Regulatory Council ("ITRC"), "History and Use of Per- and Polyfluoroalkyl Substances (PFAS)," dated September 2020, http://pfas-1.itrcweb.org/wp-content/uploads/2017/11/pfas_fact_sheet_history_and_use__11_13_17.pdf (last visited Feb. 18, 2021).

156.    Because PFAS are so water soluble, they quickly migrate through the environmental media.

157.    For illustrative purposes, Figure 4-1 below, from the Interstate Technical & Regulatory Council's Fact Sheet, "History and Use of Per- and Polyfluoroalkyl Substances (PFAS)," depicts the use and uncontained disposal of PFAS-containing firefighting foam; and shows how it may enter the groundwater, soil, and sediment, and runoff to surface water and/or sewers.



**Figure 4-1. Release of firefighting foam**
(Source: Adapted from figure by J. Hale, Kleinfelder, used with permission)

## B.    DEVELOPMENT OF PFAS, MIL-SPEC AFFF, AND THE DEFENDANT MANUFACTURERS' KNOWLEDGE OF THEIR DANGERS

### *3M Company's Pivotal Role and Its Documented Knowledge*

158.    3M developed perfluorinated chemical surfactants in 1947.

159.    3M developed these perfluorinated chemical surfactants to use in the manufacture of its own line of consumer goods, including AFFF, and to sell to other manufacturers.

160.    3M made PFOS, PFOA, PFHS, PFHpA and other PFAS beginning in the late 1940s.

161.    3M was the only manufacturer of PFOS and PFAS in the United States, until EPA pressured it to phase out production of both compounds, from 2000-2002.

162.    3M used PFOS in the 1950s to make its original Scotchgard line of stain-resistant textiles.

163.    During the 1960's, 3M used PFOS to make Mil-Spec AFFF concentrate that it sold to the United States Government.

164.    By the 1970s, 3M had also begun selling PFOS to some of the Manufacturer Defendants, who used it to make their Mil-Spec AFFF concentrates.

165.    In 1951, 3M began selling PFOA to DuPont, which used PFOA to make its Teflon products. Later, beginning in 2000 (when 3M began its phase-out of PFOA and PFOS), DuPont began making its own PFOA, until EPA pressured DuPont to phase-out its production of PFAS by 2002.

166.    During the early 1950s, both 3M and DuPont began to systematically test the physiological and toxicological properties of PFOS and PFOA.

### 3M's Knowledge of the Dangers

167.    By the 1950s, 3M knew that PFOA/S could move through groundwater.

168.    By 1960, 3M knew that its PFOS manufacturing process wastes were leaching from waste dumps at its Cottage Grove, Minnesota plant into groundwater. An internal memo from 1960 acknowledges that such wastes "[would] eventually reach the water table and pollute domestic wells." 3M concealed this fact.

169.    At 3M, inhouse toxicologists serially reported that PFAS compounds are so stable in the environment that they are "completely resistant to biological attack." The report also confirmed that these chemicals are "toxic."

31

170.    In the 1970s, 3M internal research documented the fact that PFAS had been found in the tissues of fish, and that its AFFF products were hazardous to marine life.

171.    In fact, in 1970, an independent concentrate manufacturing firm, Chemical Concentrates Corporation, attempted to conduct a limited test on the effects on marine life of 3M's "Light Water" brand of AFFF concentrates (which are contained in 3M's finished Mil-Spec AFFF). The firm began conducting a standard test using "hardy fish," but was alarmed when it observed the immediate deadly effects on the fish, all of which died. The firm reported, in a June 15, 1970 letter to the Editor of the "Fire Journal," that "Light Water" was "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."

172.    3M's subsequent toxicity testing, conducted in 1972 on "Light Water" AFFF concentrates, confirmed their toxicity to bluegill, grass shrimp, Atlantic oysters, fiddler crab, mummichog (freshwater minnows) and algae.

173.    Despite these findings and 3M's other internal knowledge of "Light Water's" toxicity and nonbiodegradability, its 1978 advertising brochure touted "Light Water" AFFF as "biodegradable" and "low in toxicity." The ad declared that "[t]ests and actual use situations have shown that animal and aquatic life are not adversely affected." The ad also stated that "as a foam solution, there are no noticeable negative effects."

174.    Through the years, 3M received other complaints from fire equipment suppliers and the Corps of Engineers' Sacramento Office about 3M's false representation that PFAS-containing AFFFs were "biodegradable."

175.    In 1988, a 3M scientist, Eric Reiner, answered these calls from the Corps of Engineers and a fire services contractor at Beale Air Force Base in Sacramento, California. Dr. Reiner frankly explained that 3M's "Light Water" 3% AFFF concentrate is toxic and not

biodegradable.

176.    In an email dated December 30, 1988, Dr. Reiner wrote to 3M executives that "I don't think it is in 3M's long-term interest to perpetuate the myth that these fluorochemical surfactants are biodegradable. It is probable that this misconception will eventually be discovered, and when that happens, 3M will likely be embarrassed, and we and our customers may be fined and forced to immediately withdraw products from the market."

177.    Nonetheless, 3M continued to sell its "Light Water" line of AFFF concentrates, which were stored, used, discharged and disposed of at the Facilities and into the Watershed.

178.    During the 1970s, 3M started to monitor PFAS levels in the blood of its plant production employees, because 3M's in-house physicians and toxicologists were concerned about the effects of human exposure, based on animal toxicity studies that showed alarming health effects.

179.    By 1976, the results of this blood monitoring program confirmed the accumulation of PFAS in its exposed employees' blood. 3M measured fluorochemicals in the blood of workers at its PF0S-manufacturing plant in Cottage Grove, Minnesota at "1,000 times normal." Employees at its Decatur, Alabama plant had PFOA blood levels at "300 times normal." Virtually all of its employees whose blood was tested had elevated PFAS levels that increased over time.

180.    3M continued to hide these facts and to actively mislead the scientific community about the presence of PFOS in human blood.

181.    In 1975, independent researchers William Guy and Richard Taves from the University of Florida School of Medicine discovered the presence of fluorine atoms in human blood from blood banks across the country. This was a disturbing discovery, as fluorine does not occur naturally in human blood.

182.    Dr. Guy and Dr. Taves contacted 3M, seeking information regarding the source of

33

these fluorines, suspecting that they had originated from 3M's manufacture of Scotchgard. During a series of telephone conferences with Dr. Guy and Dr. Taves, 3M scientists "pled ignorance," rebuked them for speculating about the source, and deliberately concealed from them the company's own knowledge that the fluorine compound found in human blood across the country was PFOS. As noted, 3M was the only manufacturer of PFOS.

183.    3M's concerted deceit of Dr. Taves and Dr. Guy, and of the scientific community that had become engaged in finding the source and effects of these fluorines in human blood, delayed outside scientific research for more than 20 years.

184.    3M's deceit continued until 1999, when a whistleblower, a former 3M scientist, alerted EPA. Meanwhile, for more than two decades, 3M continued to hide the adverse effects of PFOS and PFOA while they reaped billions of dollars of profits from sales of PFOA/S products.

185.    During those years, 3M's internal animal toxicity studies continued. In 1978, these studies demonstrated that PFOS was toxic to fat head minnows, and that that PFOA and PFOS are toxic to rats.

186.    Another 3M study showed that PFOS was highly toxic to monkeys, even in the smallest dose range. This fact was scientifically notable, because of the biological similarity between monkeys and humans.

187.    Upon information and belief, after the fatal monkey study, 3M conducted no more primate studies.

188.    However, 3M did learn of similar toxicity results of a DuPont toxicity study conducted on Rhesus monkeys, supervised DuPont's inhouse testing facility, Haskell Laboratories. Some of the DuPont monkeys given the lowest doses were suffering so badly that they had to be euthanized before the conclusion of the study.

34

189.    The results of one 90-day animal study conducted by 3M in 1978 concluded that PFAS "should be regarded as toxic," and inhouse scientists "urgently recommended that all reasonable steps be taken immediately to reduce exposure of employees to these compounds."

190.    None of these 1978 toxicity studies conducted by 3M were reported to the EPA.

191.    Regarding environmental impacts, a 1978 internal report at 3M warned that PFAS chemicals "are likely to persist in the environment for extended periods."

192.    Another 3M internal document from 1979 states that PFOA and PFOS "are known to persist for a long time in the body and thereby give long term chronic exposure."

193.    In a 1979 memo written by M.T. Case, then a 3M toxicologist and veterinarian in charge of animal studies, Dr. Case stated it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long-term chronic exposure."

194.    3M decided not to publish any of the results, findings, warnings, conclusions, or its own scientist's recommendations. Instead, it continued to make fluorochemical surfactants for use in Mil-Spec AFFF concentrates and its highly lucrative line of Scotchgard products.

195.    3M also continued to sell PFOS to other manufacturers who were making and selling Mil-Spec AFFF concentrates that were used, stored, discharged and/or disposed at the Facilities and into the environment, and which now contaminate the Watershed and the Town's drinking water supplies.

196.    3M also concealed the results of its toxicity studies on PFOA, which is contained in Mil-Spec AFFF.

197.    In the mid-1970s and throughout 1980, 3M had also conducted toxicity studies on reproductive health effects (also known as a "teratology" studies), to determine whether PFAS

caused birth defects in rats. The results of all these studies showed a host of birth defects and abnormalities in the unborn rat fetuses. One notable set of birth defects, deformations in the eyes, was especially prevalent in all these studies. The PFAS administered to the pregnant dams was also found to be "maternally toxic."

198.    On February 24, 1981, the result of 3M's most recent teratology study was complete. This study had been conducted on pregnant female rats, who were fed PFOA. Shortly before the pregnant dams gave birth, they were sacrificed, and their unborn pups examined. Of the 16 rat fetuses examined, 100% had severe eye deformities, consistent with the earlier teratology studies.

199.    The Toxic Substance Control Act ("TSCA") Section 8(e) requires chemical manufacturers to report "substantial risks" when they are discovered by a company.

200.    On March 20, 1981, 3M finally reported the result of the February 24, 1981 teratology study to the EPA and stated that this study confirmed previous (and previously unreported) rat teratology studies that produced substantially identical eye birth defects in the unborn offspring of pregnant rats fed other PFAS related to PFOA (as well as other significant deformities).

201.    3M also informed DuPont, and on March 27, 1981, two DuPont scientists from Haskell Laboratories travelled to 3M headquarters to review the results of the study. Internal DuPont correspondence reflects that these two DuPont scientists concluded after their visit that these eye deformities were caused by C8.

202.    As a direct result of this study, in April 1981, 3M moved 25 female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "as a precautionary measure."

203.    DuPont also temporarily reassigned its female plant employees at its Washington

Works plant in Parkersburg, West Virginia, to other plant jobs outside the Teflon production areas.

204.    These reassignments came too late. Seven of the pregnant DuPont employees who had worked in the Teflon department gave birth in 1981. Of their seven newborn babies, two had terrible eye defects (one eye significantly lower than the other eye, with a massively deformed eyelid), comparable to the eye defects found in the 3M rat fetuses. One of these newborn babies had only half a nose and one nostril.

205.    Despite these shocking discoveries within DuPont, the company dismissed any correlation between human baby eye defects and animal fetus eye defects and reassigned the female employees back to the Teflon area. Production continued, and DuPont employees continued to be exposed to PFOA for several more decades.

206.    Upon information and belief, DuPont and 3M also suspended further animal pregnancy toxicity studies, "indefinitely."

207.    In 1983, 3M scientists concluded that concerns about PFAS "give rise to concern for environmental safety," including "legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

208.    In May 1998, 3M submitted a misleading report to EPA noting the presence of PFOS in the blood of certain lab animals but omitting the toxicity results. Instead, according to a former 3M employee, "3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information."

209.    In March 1999, 3M environmental ecotoxicologist Richard Purdy wrote a letter of resignation to 3M expressing his "profound disappointment" with "3M's handling of the environmental risks associated with the manufacture and use of" PFOS. Dr. Purdy described PFOS as "the most insidious pollutant since PCB," and that it is "probably more damaging than PCB

37

because it does not degrade, whereas PCB does; it is more toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB."

210.    Dr. Purdy's letter recounted his many attempts to discuss the toxicity (and conduct sampling) with the company, and 3M's apparent reluctance to further these studies. Finally, Dr. Purdy stated that "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

211.    Dr. Purdy sent a copy of his March 1999 letter to the EPA.

212.    In 2000, EPA's response to Dr. Purdy's disclosures was to exert enormous pressure on 3M to stop making PFOS and PFOA.

213.    3M, now facing the likelihood of public disclosures of the dangers of PFOS that it had researched, documented, and concealed for decades - and its corresponding liability - agreed to phase out production of PFOS and PFOA by 2002.

214.    EPA released a press release about the phaseout, stating: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

215.    By contrast, 3M's press release stated that "our products are safe," touting the company's "principles of responsible environmental management" as the reason to cease production.

216.    After the phase out, 3M worked to control and distort the science of PFAS in order to minimize its liabilities. For example, 3M provided millions of dollars in grants to a professor, John Giesy, who publicly presented himself as an independent researcher, but who worked for 3M

behind the scenes. Giesy's goal, as expressed in a March 25, 2008 email, was to "keep 'bad' papers [regarding PFAS] out of the literature [because] otherwise in litigation situations they can be a large obstacle to refute."

217.    In 2006, EPA cited 3M for 244 violations of the Toxic Substance Control Act, accusing 3M of failing to notify the agency about new chemicals and of late reporting of "substantial risk information." 3M paid $1.52 million in civil penalties for these violations.

218.    However, by the time 3M paid these civil penalties, it had already begun developing shorter-chained PFAS chemicals to replace PFOS. (e.g., PFBS, another hazardous PFAS compound with associated serious health risks), for use in making its "new" Scotchguard line of products.

219.    Despite decades of its own internal medical research and monitoring demonstrating the serious health risks posed by PFAS, notwithstanding, in 2018, 3M paid the State of Minnesota $850M to settle the state's lawsuit alleging that 3M had contaminated Minnesota drinking water and other natural resources with PFOS.

220.    3M knew or should have known that in their intended and/or common use, its products containing PFAS would injure and/or threaten public health and the environment.

221.    3M knew or should have known that its PFAS containing products would be disposed and discharges into the environment, and that these toxic, highly mobile and persistent, chemicals would contaminate public drinking water wells.

**_DuPont's Knowledge of the Dangers_**

222.    By the early 1960s, DuPont's Haskell Laboratory, which conducts animal toxicity research on chemicals the company produced, had positively determined that PFOA exposure causes enlarged livers in rats and rabbits.

223.    By 1963, DuPont technical manual deem PFAS toxic.

39

224.    In 1970, DuPont scientists conclude that PFOA is "highly toxic when inhaled."

225.    Several more decades of DuPont's internal animal toxicity studies paralleled the toxicity findings made by 3M scientists noted above. Toxicity studies supervised by DuPont's Haskell Lab demonstrated that  PFOA exposure in rats, rabbits and dogs had the same alarming results: beagles expired after being fed small doses of PFOA, which was also toxic to Rhesus monkeys. All these animal species developed malignant tumors in several organs after exposure to PFOA.

226.    DuPont also knew that PFOA exposure was endangering its plant workers.  Through inhouse medical monitoring, DuPont knew that its employees had significantly elevated blood levels of PFOA, and that those levels continued to increase.

227.    DuPont's own internal research and in-house industrial medicine department had established that PFOA was toxic, and that C8 exposure caused liver enlargement, kidney and testicular pathology, ulcerative colitis, and other serious health conditions in its exposed plant workers.

228.    In 1981, after learning of the 3M rat teratology study demonstrating deformations in the eyes of rat fetuses, and the births of DuPont female plant workers' newborn babies with deformed eyes, DuPont did not  report these human babies' birth defects (or their mothers' exposures and elevated blood levels of PFOA) to EPA.

229.    DuPont dismissed the questions and fears of its plant employees, telling them that these birth defects were not caused by exposure to C8. The female workers who had been reassigned to other production units were later sent back to the C8 production department, where their exposure (and their male co-workers' exposure) continued.

230.    By 1986, DuPont knew that industrial process wastes from its Washington Works

plant in Parkersburg, West Virginia had contaminated the Ohio River and the drinking water supplies of thousands of residents serviced by at least five water districts in Ohio and West Virginia. In order to avoid reporting this contamination to the public and the regulators, DuPont simply bought these water districts, and paid to have them operated, without remediation, so the public would not find out. It did not report this contamination to EPA.

231.    In 1988, an internal DuPont memorandum designated C8 as "c," the symbol indicating "possible human carcinogen."

232.    In 1991, concerned about mounting evidence of liver enlargement in plant employees, DuPont researchers recommended that liver enzyme studies be conducted.

233.    In response, an internal corporate memorandum discussed potential liability associated with conducting the study and concluded "Do the study after we are sued."

234.    In 1993, a DuPont internal memorandum summarizes the results of an internal survey of its employees and retired employees and concludes that "Ten years of employment in the [C8] Chemical Division was associated with an estimated 3.3-fold increase in prostate cancer mortality."

235.    In 1993, additional animal toxicity studies show that C8 causes tumors to form in the liver, testes and pancreas.

236.    DuPont hid all of these facts from its employees, the public, and EPA, so it could continue reaping profits from its hugely profitable, toxic products.

237.    As noted above, in 1999 3M (which at that time was the only American manufacturer of C8 and PFOS) advised EPA and DuPont of toxicity study on monkeys, which had demonstrated deadly effects.

238.    As also noted above, EPA in 2000 compelled 3M to phase-out its production of

41

PFOS and PFOA by 2002.

239.    EPA did not learn of DuPont's decades of coverup and concealment of evidence of the toxicity of C8 until 2001, when environmental attorney Robert Bilott disclosed it.

240.    Mr. Bilott had obtained thousands of internal DuPont corporate documents, by court order, during discovery in the contamination case he had filed against DuPont on behalf of a cattle farmer whose cattle were dying from drinking water contaminated by DuPont's Washington Works plant waste. These internal corporate documents contain a trove of information about DuPont's research on toxicity and exposure to C8.

241.    In 2001, Mr. Bilott provided EPA with all those DuPont internal documents (which included its communications with 3M about toxicity and birth defects) related to PFOA.

242.    EPA administratively sued DuPont in 2004 for seven violation of TSCA between 1981 and 2004, noting DuPont's failure to report the 1981 birth defects in the children of its former pregnant plant employees, especially in light of the rat teratology study showing similar defects in rat fetuses, and other "substantial risk" of PFOA that DuPont had been documenting for decades, but not reporting. EPA fined DuPont $16.5M.

243.    During that 20-year period of hiding evidence from EPA (from 1981-2004), DuPont continued to reap huge profits from sales of its toxic products, until Mr. Bilott provided EPA with DuPont's internal corporate documents documenting birth defects, cancers and other diseases, DuPont continued to produce C8, causing the continued, unprotected expose its workers and contaminating the drinking water of thousands of people.

244.    During those twenty years of continued production, DuPont intentionally continued to conceal its own medical research documenting the toxicity of C8 from its workers, the regulators, and the public.

245. Moreover, even before paying the $16.5M fine to settle the EPA administrative action in 2005, DuPont had become the only American producer of C8, which it used to continue making Teflon and to sell to some or all of the other Manufacturer Defendants for their manufacture of Mil-Spec AFFF. DuPont continued to hide information about the toxicity of C8, and its continuing contamination of drinking water and of its workers' adverse health effects. DuPont's continuing deceit, and its reaping of billions of dollars of profit from dangerous PFOA and PFOA-containing products continued for another twenty years, until EPA compelled its phase-out in 2015.

246. Thus, during more than six decades of using and manufacturing C8, which its own scientists considered to be toxic, DuPont hid this toxicity and continued to reap billions of dollars in profits from sales to an unknowing public.

*Other Defendants Have Also Known of the Dangers of PFAS-Containing AFFF*

247. Manufacturer Defendants and their corporate affiliates knew, or at the very least should have known, that in their intended and common use, their PFAS-containing AFFF products would harm health and the environment.

248. Information regarding PFAS compounds was readily accessible to Manufacturer Defendants because each is an expert in the field of AFFF manufacturing and/or the materials needed to manufacture AFFF, including the fluorosurfactant chemical feedstocks, and each has detailed information and understanding about the chemical compounds that form AFFF concentrates.

249. After 3M's exit from the PFOA and PFOS production business, and since production of PFOS had essentially been banned by EPA, the other Manufacturing Defendants needed another source of fluorochemical surfactant to continue making Mil-Spec AFFF.

250. They turned to DuPont.

43

251. After 3M announced the phase-out in 2000, DuPont decided to begin producing PFOA, which it continued to call "C8," at its Fayetteville, N.C. plant.

252. When the DuPont C8 production facility began production in 2002, it was the only American producer of C8. It used C8 to manufacture its own products and to sell to the other Manufacturer Defendants who made AFFF.

253. Upon information and belief, three months after DuPont's production of C8 began, leaks and discharges from the plant had contaminated groundwater at the plant, and shortly thereafter, the Cape Fear River.

254. Drinking water wells throughout the Cape Fear River Watershed were soon contaminated with C8. DuPont concealed this contamination for at least two years, then denied that it had come from the Fayetteville plant.

255. In fact, DuPont continued to manufacture and use PFOA, and continued selling it to other manufacturers for their use in making Mil-Spec AFFF.

256. In 2001, DuPont became a founding member of the Firefighting Foam Coalition ("FFFC"), the AFFF trade group formed to advocate for AFFF's continued viability.

257. Some or all of the Manufacturer Defendants also became members of the FFFC, as well as a variety of other trade associations and groups, at which they shared knowledge and information regarding PFAS.

258. The FFFC-member Manufacturer Defendants, including DuPont, worked together to protect their AFFF products from scrutiny, and to promote the "safety" of PFOA.

259. The FFFC-member Manufacturer Defendants repeated the same messages for years: Only one PFAS compound, PFOS, had been taken off the market because of health risks. The FFFC-member Manufacturer Defendants claimed that because their AFFF products were not made

with PFOS, their AFFF products and feedstocks were safe.

260.    The FFFC-member Manufacturer Defendants' efforts were designed to shield members and the AFFF industry from the public and regulators, who were starting to learn about PFOA's harm to human health and the environment.

261.    Years later, after EPA had compelled Old DuPont into agreeing to phase out production of PFOA by 2015, Old DuPont designed, developed and sold PFAS replacement compounds, short chain fluorochemical surfactants and feedstocks, including "Forafac 1157."

262.    These products were promoted as "safer" replacements.

263.    Upon information and belief, after the 2015 spinoff from Old DuPont, Chemours continued the manufacture of these short chain fluorosurfactant feedstocks at the Fayetteville, North Carolina Plant.

264.    Other FFFC-member Manufacturer Defendants bought these feedstocks and also developed comparable fluorochemical feedstocks and AFFF containing PFAS replacement compounds that were widely promoted through the FFFC.

265.    The FFFC-member Manufacturer Defendants regularly published newsletters and attended conferences promoting their AFFF products.

266.    These coordinated efforts were meant to dispel concerns about the impact their AFFF products had on the environment and human health.

267.    These FFFC-member Manufacturer Defendants worked in concert to conceal known risks of their AFFF products from the government and public.

268.    Upon information and belief, the Manufacturer Defendants knew the use of their AFFF products, other than those containing PFOS, presented a similar threat to health and the environment, yet they continued to promote their AFFF products and claim they were safe.

45

269.    While this was known to the FFFC-member Manufacturer Defendants, it was not fully understood by the users of their AFFF products, regulators or the public.

270.    Despite their knowledge that PFAS posed environmental and human health risks, and despite the availability of reasonable alternatives, these FFFC-member Manufacturer Defendants failed to warn customers, users, the public or the regulators, and failed to take any other appropriate precautionary measures to prevent or mitigate contamination and endanger health and the environment.

271.    Instead, these Defendants promoted AFFF-containing PFAS as environmentally sound products appropriate for widespread use.

272.    The manufacture, distribution and/or sale of Mil-Spec AFFF and/or their fluorochemical feedstocks, without adequate warnings, by the Manufacturer Defendants has resulting in the releases of PFOS, PFOA, and other harmful PFAS at the Facilities and into the environment, where they now contaminate the Watershed and the Town's drinking water supplies.

273.    The Manufacturer Defendants, through their manufacturing, distribution and/or sale of Mil-Spec AFFF and/or other fluorosurfactant feedstocks, and through their involvement and/or participation in the creation of training and instructional materials and activities, knew, foresaw, or should have known and foreseen that, if not properly contained and disposed of, PFOS and PFOA would contaminate the environment and surrounding watersheds and drinking water supplies.

274.    The Manufacturer Defendants were aware or should have been aware, knew or should have known, and foresaw or should have foreseen that their marketing, development, manufacture, promotion and distribution of their promotional materials concerning AFFF containing PFOS, PFOA and other fluorochemical surfactant feedstocks, without adequate warnings of the dangers, would result in uncontrolled releases and contamination of the

46

environment and drinking water, including the Town's drinking water supplies.

275.   The Manufacturer Defendants knew their customers warehoused large stockpiles of AFFF and touted the shelf-life of AFFF.

276.   While the Manufacturer Defendants phased out production or transitioned to new formulas of AFFF, they did not instruct users of AFFF that they should not use existing stockpiles AFFF that contained PFOS and/or PFOA.

277.   The Manufacturer Defendants further did not act to remove these stockpiles of AFFF containing PFOA and PFOS from the stream of commerce.

278.   The Manufacturer Defendants did not warn their customers and users that improper storage, use and disposal of AFFF (including their fluorochemical surfactant feedstocks) would harm the environment, endanger human health, or cause them to incur substantial costs to investigate and clean up contamination of groundwater to contain and properly dispose of the Defendant's own AFFF products and the waste generated by their PFAS products.

279.   Accordingly, for many years after the original sale of AFFF, these AFFF products were still being discharged directly to the ground, into floor drains, and washed into sediments, soils and waters, harming the environment and endangering human health.

280.   The Manufacturer Defendants did not properly instruct users, consumers, public officials, or those who were in a position to properly guard against the dangers of PFAS, that they needed to properly dispose of their stockpiles of AFFF or how to properly dispose of AFFF.

281.   The Manufacturer Defendants' products were unreasonably dangerous, and the Manufacturer Defendants failed to adequately warn of this danger.

282.   Practical and feasible alternative designs, capable of achieving the military's goals of effective fire suppression without harming the environment and public drinking water, were

47

available to the Manufacturer Defendants.

283.    The Manufacturer Defendants knew, or should have known, that their PFAS-containing products would contaminate the environment through their manufacturing, marketing, distribution, and sales of PFAS chemicals to be used in AFFF and/or AFFF containing PFAS.

284.    Upon information and belief,  after the phase-out of PFOS and PFOS, the Manufacturer Defendants continued to design, develop, manufacture, marketed and sold their Mil-Spec AFFF and their concentrates (including their fluorosurfactant feedstocks) that have been made with shorter chained PFAS compounds that pose a similar risk to health and the environment.

285.    Upon information and belief, by the 1970s, the Manufacturer Defendants and DOD knew of the risks of PFAS to the environment and health.

286.    The Manufacturer Defendants and DOD had a duty, which they breached, to notify the USEPA when they had information that reasonably supported the conclusion that a substance or mixture presented a substantial risk of injury to health or the environment.  See Toxic Substances Control Act ("TSCA") §8(e), 15 U.S.C. §2607(e).

287.    Prior to about 1983, no containment measures were listed in MSDSs, nor were the dangers to health or the environment inherent in AFFF disclosed in the instructions, warning labels, or product packaging for AFFF.

288.    By about 1983, MSDSs for certain AFFF products directed users to collect AFFF prior to discharging to a wastewater treatment system and/or to contain liquid materials containing PFAS to prevent spilled material from reaching sewers or waterways.

289.    By 2010, but not before, Safety Data Sheets ("SDS") for certain AFFF products directed users to contain accidental releases by stopping the flow of the material, utilizing a dike for the spilled material, and preventing entry into waterways, sewers, basements, or confined

spaces. For large spill releases, SDS procedures required diking the spill for later disposal; use of non-combustible materials, such as vermiculite, sand or earth, to soak up the product; and placement of the product into a container for later disposal.

290.    By 2010, SDS procedures for recovery and removal of certain AFFF products required flushing the area with water and cleaning the surface thoroughly to remove residual contamination.

291.    MSDSs for some AFFF products provided instructions for users not to release AFFF to local wastewater treatment plants without permission.

292.    Between about 1983 and the present, these MSDSs and SDSs, instructions, warning labels, and product packaging materials did not fully describe or adequately warn users of all of the health and environmental risks of AFFF, which the Manufacturer Defendants (and the United States) knew or should have known existed.

293.    Upon information and belief, existing stocks of PFOA and PFOS may still be used, and PFOA and PFOS is contained in some imported articles.[11]

294.    Upon information and belief, AFFF containing other PFAS compounds with six carbon atoms ("Short Chain PFAS"), rather than 8 carbon atoms ("Long Chain PFAS" like PFOS and PFOA) continue to be designed, developed, manufactured, promoted, distributed and/or sold by the Manufacturer Defendants.

**LACK OF FEDERAL REGULATION OF PFAS; THE STATES' RESPONSES**

295.    In 2009, EPA developed non-enforceable "Lifetime Health Advisory Limits for PFOA and PFOS, citing the emerging scientific understanding of serious health risks associated with exposure. Those guidance levels were 400 ppt for PFOA and 200 ppt for PFOS.

---

[11] *USEPA Fact Sheet: 2010/2015 PFOA Stewardship Program*, retrieved from https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/fact-sheet-20102015-pfoa-stewardship-program (last visited Feb. 18, 2021).

49

296.    In May 2016, EPA amended its 2009 guidance on PFOS and PFOA, acknowledging that health risks include "developmental effects to fetuses during pregnancy or to breast-fed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), and other effects (e.g., cholesterol changes)." [12]

297.    EPA also reduced its 2009 "Lifetime Health Advisory Limits" for PFOS and PFOA, warning that drinking water containing a combined value of 70 ppt for PFOA and PFOS or more poses adverse human health effects.[13]

298.    However, one month later, two other Federal agencies disagreed with EPA's May 2016 health advisory levels, urging the adoption of enforceable MCLs that are a small fraction of EPA's provisional 70 ppt health advisory level.

299.    In June 2016, the Agency for Toxic Substances and Disease Registry ("ATSDR") of the U.S. Public Health Service and the U.S. Department of Health and Human Services ("HHS") issued an 852-page scientific report, reflecting the results of a 3-year toxicology study, the ATSDR Draft Toxicological Profile for Perfluoroalkyls, dated June 2016 ("ATSDR Tox Profile")[14]

300.    The ATSDR set forth data it used in analyzing the long half-lives of PFAS, their invariable persistence and propensity to bioaccumulate in humans, and the strong associations and occurrence of adverse health effects, including immune system disruption, organ damage, damage to human reproductive capabilities, blood disease, and delayed development in infants and children. Based upon this 3-year study, the ATSDR concluded that PFOA, PFOS, PFNA and PFHxS may be

---

[12] *Id.*

[13] *See* Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate ("Health Advisory"), dated May 25, 2016, 19 Fed. Reg. 101.

[14] *See Draft Toxicological Profile for Perfluoroalkyls*, dated June 2018, retrieved from https://www.atsdr.cdc.gov /toxprofiles/tp200.pdf (last visited Feb. 18, 2021).

harmful to humans at levels as low as 6.9 ppt, 10 ppt, 10 ppt, and 70 ppt, respectively. [15]

301.    The ATSDR Toxicological Profile also finds that there is suggestive evidence that PFOA and PFOS are carcinogenic.[16]

302.    Upon information and belief, EPA and DOD had previously tried to suppress HSS's release of the ATSDR Tox Profile, fearing a "public relations nightmare" over the significantly lower PFAS minimum risk levels documented by the ATSDR.  HSS prepared the draft ATSDR Tox Profile over EPA's and DOD's objections for publication and public comment in the Federal Register.

303.    EPA did nothing further until February of 2020, when it released an updated Action Plan for the regulation of PFAS contaminants, setting a goal of establishing enforceable maximum contaminant levels ("MCLs") for the most common forms of PFAS, PFOA and PFOS, in accordance with the Safe Drinking Water Act.  It also sought to add PFOA and PFOS to the list of CERCLA hazardous substances and restrict the use of PFAS in commerce. [17]  To date, the EPA has not yet done so, and the guidance levels in EPA's May 2016 levels remain unenforceable.

304.    Several states, including New York, have already adopted protective, enforceable MCLs and other guidance restricting the use and production of several PFAS compounds.

305.    New York State added PFOA and PFOS to the New York State list of CERCLA hazardous substances, at 6 N.Y.C.R.R. §597.3.

306.    New York State also adopted enforceable drinking water standards for public water systems, including  MCLs of 10 parts per trillion (10 ppt) for PFOA; and 10 ppt for PFOS.  These

---

[15] *Id.*

[16] *Id.*

[17] See *EPA's Per- and Polyfluoroalkyl Substances (PFAS) Action Plan*, dated February 2020, retrieved from https://www.epa.gov/sites/production/files/2020-01/documents/pfas_action_plan_feb2020.pdf (last visited Feb. 18, 2021).

51

MCLs govern the New Windsor Consolidated Water District and the standards of water it can supply to the public.

307.    Seven other states have also rejected EPA's provisional 70 ppt guidance level for PFOA/PFOA and adopted enforceable MCLs that are comparable with those of New York and the ATSDR minimum risk levels cited above.

308.    These states include New Jersey, Minnesota, Michigan, California, New Hampshire, Vermont and Massachusetts.[18]

309.    Upon information and belief, there at least 24 firefighting foam products currently on the market that do not contain PFAS, including products manufactured by Angus Fire Ltd., Auxquimia, S.A.U., Dafo Fomtec AB, and The Solberg Company.  These fluorine-free products do not impair the reasonably anticipated or intended function of AFFF and are economically and technologically feasible.

## CONTAMINATION OF THE FACILITIES, THE WATERSHED AND THE TOWN'S DRINKING WATER SUPPLIES

### A.    THE BASE

310.    The Base is a Class 2 New York State Superfund Site, Site # 336089.  Its Class 2 designation means that it is a site at which:

> "the disposal of hazardous waste has been confirmed and the presence of such hazardous waste or its components or breakdown products represents a significant threat to public health or the environment."

---

[18] New Jersey: 14 ppt PFOA; 13 ppt PFOS
Minnesota: 27 ppt PFOA; 15 ppt PFOS
Michigan: 8 ppt PFOA; 16 ppt PFOS
California: 10 ppt PFOA; 40 ppt PFOS
New Hampshire: 12 ppt PFOA; 15 ppt PFOS; 11 ppt PFNA; 18 ppt PFHxS;
Vermont: 20 ppt for PFOA, PFOS, PFNA, PFHxS and PFHpA in any combination
Massachusetts: 20 ppt for PFOA, PFOS, PFNA, PFHxS, PFDA in any combination

311.    The Base is located at 1 Maguire Way, Newburgh, New York 12550, but its property sits on at least two parcels in both the Town of Newburgh and the Town of New Windsor.[19]

312.    The State, through NYDSDOT, owns the Base Property and the Airport Property.

313.    The Base Property is generally bounded by the Airport Property on the west, Route 17K to the north, Route 87 to the east, and primarily vacant land and land used for minor Base or Airport operations to the south.

314.    The Base Property is located upgradient of Kroll Well and Butterhill Wells.

315.    Upon information and belief, the Base Property and part of the present Airport property (previously known as Stewart Air Force Base) have been used for military operations since 1942.  Commercial operations at the Airport began in the 1970s.

316.    DOD is the current lessee and operator of the Base Property pursuant to the terms of a lease with the NYSDOT, dated December 31, 1982 ("USA Lease").

317.    Under the terms of the USA Lease, the United States Air Force, USANG, and the US Marine Corps Reserve are the operators of the Base Property.

318.    The NYANG 105th Airlift Wing, an Air Mobility Command, also operates at the Base pursuant to License Number DACA51-3-84-61, which was granted to the State from the Air Force on or about April 1, 1983.

319.    Upon information and belief, the Base Property contains approximately 36 buildings, including hangars to store aircraft, a fire house, a former fire house, a nozzle testing area, an apron, a storm sewer system, an industrial waste sewer system, outfalls, and two man-made lagoons.

---

[19] Orange County Tax Map Parcel # 89-1-79 and Parcel # 3-1-63.2, respectively.

53

320.   A 48-inch diameter pipe carrying stormwater originates in an open ditch along the south side of NYS Route 17K, near the intersection of 17K and Industrial Drive. It extends under the Base and ultimately discharges to Rec Pond, its retention basin.

321.   Upon information and belief, since the late 1960s and to the present date, the Base Owner and Operators (NYSDOT, DOD and NYANG) have used and/or mandated the use of Mil-Spec AFFF containing PFAS at crash sites, training areas, fuel tanker areas, Hangars 100-102, and fire station buildings and fire truck maintenance buildings, among other locations, with inadequate or failing containment measure in place, thereby discharging and improperly disposing of PFAS into surface waters, groundwater, soil, and sediment at the Base Property. These contaminants migrated into Rec Pond, Silver Stream, Moodna Creek and the groundwater that supplies Kroll Well and Butterhill Wells, all of which was foreseeable or should have been foreseeable to the Base Owner and Operators.

322.   Upon information and belief, since the late 1960s, the Base Owner and Operators have discharged AFFF containing PFAS into the environment at the Base Property and Airport Property, where it migrated off-site and into the Watershed.

323.   During this time, the Base Owner and Operators further failed to repair inadequate and/or leaking industrial waste systems, broken valves, leaking storage tanks, and inadequate lagoons, which resulted in a failure to properly contain these discharges. These failures caused foreseeable releases of hazardous substances, including PFAS, into the surface water, soil, groundwater, and sediment at the Base Property and Airport Property, which resulted in discharges of PFAS into Rec Pond, Silver Stream, Moodna Creek and the groundwater that sources the Town's drinking water supplies.

324.   For example, on April 30, 1990, NYSDEC Spill Response Form for Spill No.

9001143 documented approximately 2,000 gallons of Tyco/Ansul AFFF concentrate that was discharged at Stewart Air Base due to DOD personnel improperly operating a manual valve. The discharged AFFF concentrate entered the water mains in hangars 100 and 101 and was discharged into the floor drains and, upon information and belief, into the storm drain which discharges into Silver Steam, thereby contributing to the contamination of the Town's drinking water supplies.

325.    In July 1990, a corroded valve in Hangar 100 malfunctioned and led to the discharge of "untold gallons" of AFFF concentrate in Hangar 100. This discharge drained through the floor drains in Hangar 100 and from there, into the surrounding environment. This incident is described in a contemporaneous article in *The Sentinel*, a local newspaper.

326.    On August 10, 1990, NYSDEC Spill Response Form for Spill No. 9005228 documented foamy contaminated wastewater, including AFFF and/or fuel, that had been discharged from a lagoon into Rec Pond and then into Silver Stream.

327.    Upon information and belief, in or around February and March 2017, DOD personnel discharged AFFF concentrate in and around the firehouse building at the Base, which ultimately discharged into the surrounding environment.

328.    Upon information and belief, DOD and NYANG personnel have also discharged Mil-Spec AFFF containing PFAS in and around the firehouse, while they were washing trucks.

329.    As set forth in Section 4 of USANG's *Draft Final Preliminary Assessment Site Visit Report for Stewart Air Base*, dated February 2016, additional discharges of Mil-Spec AFFF into the environment may have occurred in connection with inadvertent or improper activations of automatic fire suppression systems, storage, and handling of AFFF, or otherwise.

330.    DOD mandated the use of Mil-Spec AFFF at the Base and at the Airport, which is federally funded.

55

331.    The Base's Owner and Operators (NYSDOT, DOD and NYANG) had a duty to properly store and use (not dump) AFFF on the Base Property. They had a duty to prevent it from being discharged and/or disposed of into soils, groundwater, and surface waters, in conformance with numerous military directives, the Base State Pollutant Discharge Elimination System ("SPDES") permit, and NYSDEC regulations prohibiting discharges of hazardous substances into the waters of the State of New York, and waters of the United States, including groundwater.

332.    Despite having knowledge of contamination being discharged into the surrounding soils, groundwater, and surface waters at the Base and Airport Properties, and into Rec Pond which flows into Silver Stream and into the Watershed, Defendants failed to timely and/or adequately warn local municipal water districts, including the Town of New Windsor, City of Newburgh and Town of Newburgh, of the contamination.

333.    By 1987 or earlier, the Air Force (and other Federal Agencies) issued guidance documents, technical letters, and instruction manuals, including but not limited to obtaining approved Storm Water Pollution Prevention Plans ("SWPP") and Spill Prevention Control and Countermeasure Plans ("SPCC") that specifically directed military employees to prevent PFAS from entering the environment, to design new environmentally acceptable training facilities, to discontinue use of inadequate training facilities, and to use containment systems that would eliminate the improper disposal of AFFF.

334.    Despite being put on notice by these pre-1987 directives, it took the Base and Airport Owner and Operators approximately ten years to commence attempts to mitigate improper PFAS disposals.

335.    In or about 1997, and thereafter, they constructed four lagoons, which they continue to use and control.

56

336.    The intended purpose of the lagoons was to separate major de-icing events and Mil-Spec AFFF discharges from the stormwater drainage system and prevent high concentrations of AFFF containing PFAS from being improperly disposed into the Storm and Sanitary Sewer Systems.

337.    Upon information and belief, the lagoons were not designed to, and do not capture all Mil-Spec AFFF discharges and disposals.

338.    The lagoons failed and/or leaked and/or did not provide adequate containment of PFAS, which are still discharged into the environment.

339.    Upon information and belief, Mil-Spec AFFF containing PFAS is currently stored, used, discharged, disposed of and/or released at the Base on the Base Property.[20]

340.    Select sampling data results from NYSDEC's preliminary investigation of the Base Property appear below:

Base Property

- March 2016 and May 2016 samples: PFOS measured in the surface waters at Base Outfalls A, 002, 003, 017K, and 010 located at Rec Pond at a range of 60 ppt to 5,900 ppt.
- June 2016 samples: PFOS identified in the groundwater at sampling locations surrounding the apron on the Base Property at 21 ppt, 190 ppt, and 3,160 ppt.
- June 2016 and September 2016 samples: PFOS identified in the catch basin water at sample locations surrounding the apron on the Base Property ranging from 14 ppt to 6,990 ppt.
- August 2016 samples: PFOS identified in the surface soil at sample locations surrounding the apron on the Base Property at 320 ppt, 470 ppt, and 5,620 ppt.
- September 2016 samples: PFOS, PFOA, and other PFAS identified in nine surface water samples on the Base Property. PFOS was identified at a range of 17 ppt to 3610 ppt; PFOA was identified at a range of 13 ppt to 520 ppt; total PFAS ranged from 74 ppt to 5,843 ppt.
- September 2016 samples: The total PFAS identified in groundwater on the Base Property at MW-3 measured at 368 ppt.
- March 2017 samples: PFOS identified in the surface waters of the floor drains at the

---

[20] *See* "NYSDEC Class B Fire Suppression Foam Usage Survey - New York State Airports," retrieved from https://www.dec.ny.gov/docs/remediation_hudson_pdf/pfoasurvey2.pdf (last visited Feb. 18, 2021).

Base Property at the Firehouse at concentrations up to 480,000 ppt.

- October 2017 samples: PFOS identified in the Retention Basin surface water at 2,520 ppt.
- October and November 2017 samples: PFOS measured in the surface water at Base Outfalls 002, 003 and 010 located at Rec Pond at range of 607 to 1,710 ppt. PFOS identified in groundwater on the Base Property at the following Potential Release Locations ("PRL"): PRL-1 at 137 ppt; PRL-2 at 174 ppt; PRL-3 at 714 ppt; PRL-15 at 4,920 ppt; and the former base landfill at 262 ppt. PFOS identified in the surface soils at various locations throughout the Base at concentrations up to 520,000 ppt. The Total PFAS identified in groundwater on the Base property ranged from 7 ppt to 11,562 ppt. The Total PFAS identified in groundwater downgradient of the Base ranged from 34 ppt to 3,344 ppt.

## B.    THE AIRPORT PROPERTY

341.    In addition to listing the Base as a State Superfund Site, NYSDEC has also classified at least a portion the adjacent Airport Property as a Class P, or Potential Superfund Site, Site # 336088.[21]

342.    The Airport is located at 1180 1st Street, New Windsor, New York 12553, and is composed of numerous parcels in the Town of Newburgh and Town of New Windsor, Orange County, New York.

343.    The Airport Property is located upgradient from Kroll Well and Butterhill Wells and is located in both the Moodna Watershed and the Quassaick Watershed.

344.    As noted above, the Airport is owned by the State, through NYSDOT. It currently has at least one operator under control of NYSDOT.

345.    PANYNJ has operated the Airport on the Airport Property, pursuant to a lease with the NYSDOT, since at least November 2007.

---

[21] The Class "P" designation is used for sites where preliminary information indicates that a site may have contamination that makes it eligible for consideration for placement on the Registry of Inactive Hazardous Waste Disposal Sites (commonly referred to as the list of State Superfund Sites). Further information and/or investigation, in the form of a site characterization, is needed to determine if a Class P site qualifies for listing of the site on the Registry. Generally, to qualify for placement on the Registry, there must be evidence that hazardous waste was disposed on the site and that any resulting contamination presents a significant threat (or reasonably foreseeable threat) to public health or the environment.

346.    Upon information and belief, Defendants John Does 1-10 have also owned and/or operated on the Airport Property.

347.    Upon information and belief, some or all of the Airport Property was previously operated as Stewart Air Force Base, a military installation owned and/or operated by DOD and its agencies.

348.    Before PANYNJ became the operator of the Airport Property, it was operated by a corporate predecessor of National Express, pursuant to a lease with NYSDOT, dated on or about March 30, 2000.

349.    Upon information and belief, after National Express cancelled its lease, PANYNJ signed a new lease in December 2019 with Defendant Avports, which now operates the Airport.

350.    Upon information and belief, since the late 1960s and to the present date, the Airport Owner and Operators used Mil-Spec AFFF containing PFAS at crash sites, fuel tanker areas, training areas, fire suppression system testing areas, the Former Nozzle Testing Area, and Buildings 142 and 2241, among other locations, without containment measures or with inadequate or failing containment measures.

351.    Their failure to contain and properly dispose of AFFF concentrate and hydrocarbon residues resulted in discharges of these contaminants into the surrounding soils, groundwater, and surface waters, and into the Watershed, where they migrated through Silver Stream and Moodna Creek, and into the aquifers that source the Kroll Well and the Butterhill Wells.

352.    Additionally, regular discharges of Mil-Spec AFFF occurred at the Former Nozzle Testing Area near Building 142, which were not contained or were inadequately contained.

353.    Upon information and belief, since the late 1960s, disposals of PFAS occurred at the Airport Property from leaking storage tanks, broken valves, cracked walls and floors, and during

59

testing of fire suppression systems, false alarms and maintenance, without containment measures or with inadequate or failing containment measures, leading to the foreseeable release of PFAS into surrounding surface waters, groundwater, soils, and sediment at the Airport Property.

354.    These improper discharges and disposals at the Airport into the Watershed resulted in the foreseeable contamination of Rec Pond, Silver Stream, Moodna Creek, and the groundwater that sources the Town's drinking water supplies.

**The Airport FedEx Fire**

355.    On September 5, 1996, a Douglas DC-10, operated by FedEx as Flight 1406, made an emergency landing at the Airport because of a mid-air fire in the plane's cargo hold.

356.    After landing, a high-volume broadcast of Mil-Spec AFFF was discharged and/or released to extinguish the flames. Thousands of gallons of Mil-Spec AFFF and the residual hydrocarbon wastes were hosed off the runway, into the surrounding grass and soils. The plane was completely destroyed.

**The Atlantic Aviation Spill**

357.    On or about April 13, 2019, Mil-Spec AFFF was released from a hangar at the Airport. The hangar was leased and operated by Defendant Atlantic Aviation.

358.    Following this release, the Mil-Spec AFFF was not contained on the Airport Property, but was allowed to flow into Silver Stream, where it was observed flowing down, approximately 2 miles past the Silver Stream Diversion Gate, towards Moodna Creek and Town Property.

359.    Surface water testing in the Watershed following the release of this Mil-Spec AFFF from Atlantic Aviation showed elevated levels of PFAS.

360.    The Airport Owner and Operators had a duty to exercise reasonable care to adequately contain these discharges of spent Mil-Spec AFFF concentrate and their hydrocarbon

60

residues, and to prevent them from accumulating and contaminating the surrounding soils, groundwater, and surface waters at the Airport.

361.    As a result of this breach of duty, these PFAS discharges contaminated the Airport Property and the Watershed, leading to the foreseeable contamination the Watershed and the Town's drinking water supplies.

362.    While the Airport Owner and Operators (PANYNJ, NYDOT, FedEx, National Express, Atlantic Aviation and John Does 1-10) were required by DOD to use Mil-Spec AFFF containing PFAS at the Airport, they were not permitted to dump it, and they had a duty to contain and properly dispose of its wastes to prevent PFAS-contaminated concentrate and residual hydrocarbons from entering the surrounding sediment, soils, groundwater, and surface waters at the Airport Property, and to prevent such discharge into the Watershed, Silver Stream, Moodna Creek and the Town's drinking water supplies.

363.    Their failure to do so has led to the foreseeable contamination of the Butterhill Wells.

364.    None of the Airport's Owner or Operators has remediated the PFAS contamination at the Airport Property, the Watershed or Town Property. Below is select sampling data:

Airport Property
- June 2016 samples: Combined measure of PFOS and PFOA in soil on the runway near Airport Outfall 003 at a range of 6,680 ppt to 1,845,680 ppt, and total PFAS ranging from 7,400 ppt to 1,897,580 ppt. Combined measure of PFOS and PFOA in soil just north and northeast of Building 142 at a range of 6,370 ppt to 596,670 ppt, and total PFAS ranging from 7,730 ppt to 619,140 ppt.
- July 2016 samples: Combined measure of PFOS and PFOA in the surface waters at Airport Outfalls 003, 005, 008, 010, 011, and 013 at a range of 19 ppt to 306 ppt, and total PFAS ranging from 14 ppt to 462 ppt.
- July 2016 samples: PFOS in groundwater north of the runway ranging from 120 ppt to 340 ppt.

## C.    CONTAMINATION OF THE WATERSHED AND THE TOWN'S WELLS

**Violations of SPDES permits by the Base Owner and Airport Operators**

365.    Pursuant to SPDES Permit NY-0250457 ("Base SPDES Permit"), NYANG discharges stormwater and/or wastewater from outfalls on the Base Property (and/or Airport Property) into Rec Pond, a tributary of Silver Stream, and also from the Base into the Watershed.

366.    Section F of the Base SPDES Permit prohibits discharges of "contained firefighting runoff, fire training water contaminated by contact with pollutants or containing foam or fire-retardant additives."

367.    NYSANG has held the Base SPDES Permit since October 31, 2007.

368.    Upon information and belief, NYSANG and/or other operators of the Base, and/or NYSDOT as owner, discharged and continue to discharge AFFF and other pollutants in violation of the Base SPDES Permit, leading to contamination of the NYSDOT Property and the Watershed.

369.    Pursuant to SPDES Permit NY-0234915 ("Airport SPDES Permit"), PANYNJ discharges stormwater and/or wastewater from Outfall 014 into Rec Pond, a tributary of Silver Stream, which flows into Moodna Creek and into the Town's drinking water supplies.

370.    Section F of the Airport SPDES Permit prohibits discharges of "contained firefighting runoff, fire training water contaminated by contact with pollutants or containing foam or fire-retardant additives."

371.    PANYNJ has held the Airport SPDES Permit since on or about October 31, 2007.

372.    Prior to PANYNJ, National Express' predecessor SWF held the Airport SPDES Permit from on or about December 1, 2001 to October 30, 2007.

373.    Prior to SWF, NYSDOT held the Airport SPDES Permit from on or about December 1, 1991 to December 1, 2001.

374.    The drainage area for Airport Outfall 014 is approximately 90 acres and encompasses grassy areas between Airport Runway 16/34 and the Base, and an area between the

62

Base and Airport Runway 9/27 on the NYSDOT Property.

375.    In the Airport SPDES Permit, Airport Outfalls identified as 008, 009, 011, 012, 013, and 015 list "Trib of Moodna Creek" as their receiving waters, which is Silver Stream.

376.    Upon information and belief, Airport Outfalls 008, 011, and 013 discharged stormwater, and water associated with industrial activity, directly into Silver Stream, which flowed into the Moodna Creek and its groundwater, thereby leading to contamination of the Town's drinking water supplies.

377.    Upon information and belief, Airport Outfalls 009, 012, and 015 discharged stormwater directly into Silver Stream, which flowed into the Moodna Creek and its groundwater, thereby leading to contamination of the Town's drinking water supplies.

378.    When the Silver Stream Diversion Gate is closed, waters from Rec Pond flow directly down Silver Stream to the Moodna Creek.

379.    Waters from Moodna Creek recharge the Butterhill Wells, the Town's main drinking water source.

380.    Upon information and belief, the Silver Stream Diversion Gate was kept open until PFAS contamination was discovered in Washington Lake in or around May of 2016.

381.    Upon information and belief, on and after May 2, 2016, the Silver Stream Diversion Gate was closed, which allowed the contaminated waters of Silver Stream to flow, unimpeded, into the Moodna Creek and its groundwater, contaminating the Town's drinking water supplies.

382.    Upon information and belief, neither the City of Newburgh or the State consulted with the Town of New Windsor or advised the Town of New Windsor about the closure of the Diversion Gate.

383.    Upon information and belief, PANYNJ, National Express, NYANG, John Does 1-

10, other operators of the Airport and Base, and/or NYSDOT as owner, discharged and continue to discharge AFFF concentrate contaminated with PFAS and other pollutants in violation of their SPDES Permits. These discharges have contaminated the Watershed, including Rec Pond, Washington Lake, Silver Stream, Moodna Creek, and groundwater that sources the Town's drinking water supplies.

384.    Select sampling results of these downstream waters appear below:

Downgradient of Base Property

- May 2018 samples: PFOS and Total PFAS (limited to six (6) UCMR-3 PFAS compounds) measured in surface water in the tributary downstream of Rec Pond were 439 ppt and 682 ppt, respectively. PFOS and Total PFAS measured in surface water in Silver Stream were 176 ppt and 259 ppt, respectively. PFOS and Total PFAS measured in surface water in the Silver Stream Diversion area were 108 ppt and 209 ppt, respectively.
- May 2018 samples: PFOS and Total PFAS in groundwater at monitoring wells distal to the Base and along Route 209 were 18 ppt and 133 ppt, respectively.
- April 2019 samples: PFOS and Total PFAS (limited to six (6) UCMR-3 PFAS compounds) measured in surface water entering and in Recreation Pond at 490 ppt and 717 ppt, respectively.

Silver Stream

- March through May 2016 samples: PFOS identified in Silver Stream surface water, at levels up to 290 ppt.
- October 2017 samples: PFOS measured in the Rec Pond tributary surface water to Silver Stream at levels up to 11,800 ppt. PFOS measured in surface water in the Silver Stream diversion area, into Washington Lake, at levels up to 181 ppt and total PFAS[22] of 433 ppt.
- October and November 2017 samples: PFOS measured in Silver Stream surface water at levels up to 281 ppt.

385.    On April 13, 2019, releases of AFFF containing PFAS were released from the Atlantic Aviation hangar at the Airport. This AFFF was observed flowing past the Silver Stream

---

[22] Upon information and belief "Total PFAS" include any and all PFAS that were sampled for, and may include up to 21 compounds, but not all PFAS that have been manufactured or used by Defendants.

Diversion Gate towards Moodna Creek. Subsequent sampling reflected the following contamination directly attributable to the negligent spill:

### Moodna Creek

- April 15, 2019 (following the April 13, 2019 Atlantic Aviation Spill): PFOS at 25 ppt; PFOA at 23.5 ppt.
- June 17, 2019 surface water samples from Silver Stream at its point of entry to Moodna Creek: PFOS at 176 ppt, PFOA at 27 ppt.
- August 2020 samples: PFOS and Total PFAS measured in Moodna Creek surface water, near Butterhill Wells, at SS-11, 31ppt and 90 ppt, respectively, and at SS-12, 16 ppt and 66.2 ppt, respectively.

386.   The State and DOD have recognized that the PFAS contamination from Rec Pond migrated into Silver Stream, the contaminant pathway for contamination of Washington Lake.

**Closure of the Silver Stream Diversion Gate**

387.   Events following discovery of the contamination of Washington Lake hastened the contamination of the Moodna Creek and the Butterhill Wells.

388.   As discussed above, in May 2016, the Silver Stream Diversion Gate (which was normally kept open, allowing Silver Stream to flow into the Lake) was closed to keep contaminated flows out of the Lake.

389.   DOD and the State have recognized that closing the Silver Stream Diversion Gate resulted in Silver Stream's free flow into the Moodna Creek.

390.   The Moodna Creek sources the Butterhill Wells groundwater supplies.

391.   In February of 2017, PFAS contamination was discovered in Kroll Well. The Town shut down Kroll Well and did not reactivate it until a permanent granular activated carbon filtration system was installed to treat the PFAS to non-detectible levels.

392.   On April 4, 2019, the New York State Department of Health first advised the Town

in writing that the Butterhill Wells had become contaminated with PFAS.

393.    Upon learning of the contamination of the Butterhill Wells, the Town decided to take the same precaution it took with Kroll Well. The Butterhill Wells were shut down.

394.    The loss of the Butterhill Wells has damaged the Town, as detailed below.

## THE TOWN'S DRINKING WATER SUPPLIES

395.    For many years, the Town of New Windsor, like other Orange County municipalities, purchased "New York City" water from the New York City Department of Environmental Protection ("NYCDEP" or "NYC"). This water was sourced from the Catskill Aqueduct. The Town filtered the water at its Riley Road Filtration Plant.

396.    Over the years, the price to buy water from NYCDEP rose precipitously, especially as the Town grew, demand rose, and the Town was forced to purchase water over and above its allotted share. Such overages could cost three times the usual amount.

397.    Moreover, NYC water has to be filtered before it is treated. The extreme turbidity of the Ashokan Reservoir waters (the source of the Catskill Aqueduct water) occasionally caused failure at the Town's Riley Road Filtration Plant.

398.    These were the reasons the Town began to look for alternative groundwater supplies that could produce enough water to eliminate the Town's dependence on NYCDEP.

399.    The Town identified groundwater supplies in the Kroll wellfield and the St. Anne wellfield, undertook well development and construction at each of these sites and put both online in 2015. Neither well can produce anywhere near the Town's demand, however. The Kroll Well was able to produce approximately 350,000 gallons per day ("gpd") and the St. Anne Well approximately 100,000 gpd. The Town's demand averages approximately 3.0 million gpd. Moreover, the water from the St. Anne's Well turned out to be too hard and, thus, was not kept

online.

400.    The Town continued its search for additional groundwater sources and found a groundwater source that would be developed as the Butterhill Wells. This source was located in a sand and gravel aquifer in Butterhill Park, on Forge Hill Road, in the Town of New Windsor. As noted above, the Butterhill wellfield is recharged by the Moodna Creek, a tributary of the Hudson River.

401.    The Butterhill wellfield proved to be so productive that it would support three production wells, producing abundant supplies of high-quality drinking water that could be finished onsite and not have to be filtered, as is the case with Catskill Aqueduct water.

402.    The Town planned, designed, and developed Butterhill Wells in collaboration with NYCDEP, which needed additional backup supplies of drinking water for its other Orange County municipal water customers during scheduled shutdowns of the Catskill and Delaware Aqueducts.

403.    Periodically, NYCDEP has to shut both Aqueducts for several weeks at a time (although not simultaneously), to perform scheduled maintenance and repairs on these 100-year-old infrastructures. These shutdowns can last for weeks at a time, during which the City would not be able to supply drinking water to its Hudson Valley customers.

404.    The Butterhill Wells were designed to fill the gap. Butterhill Wells have a rated production capacity of 6.45 mgd.

405.    Thus, the Butterhill Wells can supply more than twice the Town's daily need of 3 mgd and can produce substantial supplies in excess of the Town's daily needs, in order to provide water to neighboring municipalities when NYCDEP shuts down the Catskill and/or Delaware Aqueducts.

406.    Moreover, because it is sourced from groundwater, Butterhill water does not have

to be filtered, and can be finished onsite, and placed directly into the interconnecting municipal water systems.

407.    The Town entered into an intermunicipal agreement with the Town of Newburgh, obligating it to supply the Town of Newburgh with up to 2.0 mgd of drinking water during the 2022 and 2023 planned shutdown of the Delaware Aqueduct.

408.    In April 2016, the Town sampled the three production wells then under development pursuant to 10 NYCRR Part 5, Subpart 5-1, be sure there was no contamination of the wellfield. That sampling showed that the Butterhill wellfield's groundwater was clean and met state drinking water standards.

409.    Development of the wells still was underway in May 2016, when NYSDOH discovered PFAS contamination in Washington Lake. As a precaution, NYSDOH sampled the Butterhill wellfield groundwater and the production wells for PFAS contamination. The results were "clean," development went forward.

410.    On October 5, 2018, The Butterhill Wells Treatment and Filtration Plant ("Butterhill Wells," and "Town Property"), went online full time.

411.    The Butterhill Wells were a major success, immediately going into production as the Town transitioned sections of the Town's Consolidated Water District off NYC water and onto full consumption of Butterhill Wells water.

412.    The Town had finally ended its reliance on Catskill Aqueduct water, recognizing a tremendous cost savings in the months that followed.

413.    After approximately six months of successful operation, however, the results of sampling performed by NYSDOH revealed PFAS in the Butterhill Wells.

414.    In an abundance of caution, the Town decided to shut down the Butterhill Wells, as

both Town engineers and NYSDEC engineers, with whom the Town consulted, believed that continued pumping of the wells at their full capacities would result in increasing infiltration of the PFAS contamination.

415.    Moreover, the Town knew that the State was considering, and wood likely adopt a protective MCL of 10 ppt for PFOA and 10 ppt for PFOS.  Continuing to pump the three Butterhill Wells would likely increase their contaminant levels and overtake the 10 ppt MCLs to which all public water districts in New York would have to adhere.[23]

416.    Further, the Town did not want to endanger the health of its residents, especially in light of ever emerging information regarding the toxicity of PFAS.

417.    The design, construction, and development of the Butterhill Wells cost approximately $31M.  NYCDEP contributed approximately $12M to its construction, and the Town issued municipal bonds to finance the remaining amount.  The Town continues to pay for this brand-new source of drinking water that the Defendants have contaminated, despite the fact it cannot currently be used as intended without treatment.

418.    As a direct result of the contamination, the Town had to reactivate the Riley Road Filtration Plant, so it could filter Catskill Aqueduct replacement water that it now had to resume buying from NYCDEP.  This substantial expense, unaccounted for in the 2019 Town budget, was in addition to the required repayment of the aforementioned bond and related interest costs for the Butterhill Wells.

419.    In addition, the Town has been compelled to hire counsel with expertise in the field of environmental law, in order to prosecute this action and defend against claim filed by residents who allege that they have been served with contaminated drinking water from the time the Butterhill

---

[23] Subsequently, the State did adopt MCLs of 10 ppt for PFOS and 10 ppt for PFOA.

Wells were placed online until the Wells were shut down.

420.    The Town has further been compelled to pay for the services of an environmental consultant, retained by legal counsel to investigate the nature and extent of the contamination, respond to the contamination, and to explore remedial options.

421.    As a direct result of this contamination, the Town is in further jeopardy, because it cannot produce enough clean drinking water to supply the Town of Newburgh with drinking water during the next shutdown of the Delaware Aqueduct, as it is contractually obligated to do.

422.    Notably, PFAS contamination was also discovered in the water sourcing the Kroll Well, requiring the Town to shut it down in February of 2017 – one year after it went online.

423.    Kroll Well is near the Base and the Airport.

424.    The NYSDEC constructed a permanent GAC treatment system at the site of the Kroll Well, which allowed the Town to put Kroll Well back into production in or around September of 2019.

425.    NYSDEC has also constructed a temporary GAC treatment system to filter the water sourcing the Butterhill Wells. However, the Butterhill Wells GAC treatment unit is temporary and only partial; is only large enough to treat up to 2.15 mgd. This is insufficient to meet the Town's full demand, and it imperils both the Town and the Town of Newburgh, neither of which can now be assured of having sufficient primary and/or backup sources of potable drinking water when NYCDEP shuts down the Delaware Aqueduct for scheduled repairs of up to six (6) months at a time in 2022 and 2023.

426.    To date, the State has refused to construct a permanent, full-sized GAC treatment facility at the Butterhill Wells treatment plant, which would be capable of treating water from the Butterhill Wells at their fully rated capacity of 6.45 mgd.

427.    To date, The United States has refused to remediate the contamination of Butterhill

Wells.

428.    The Town did not contaminate or contribute to the contamination of Butterhill Wells

or the Kroll Well.

429.    The Town did not agree to allow the Defendants' waste streams into its wellfields.

## THE UNITED STATES HAS FAILED TO RESTORE THE TOWN'S WELLS OR COMPENSATE THE TOWN FOR LOSSES INCURRED DUE TO CONTAMINATION IT RELEASED AT THE FACILITIES AND INTO THE SURROUNDING ENVIRONMENT

430.    DOD and NYSDEC have undertaken preliminary environmental investigations of

the Base Property.  NYSDEC also undertook an investigation of a former industrial site on Moodna

Creek, upstream of the Butterhill Wells.

431.    Upon information and belief, the only tangible action taken by the United States to

date to address off-site contamination is construction of an Interim Storm Water Treatment System

("ISWTS"), which is supposed to treat the overflow and effluent from Rec Pond.  The system

includes only limited GAC treatment and an ion exchange system, in an attempt to treat both Long

Chain PFOA/S and other Short Chain PFAS that have migrated off the Facilities into Rec Pond.

432.    However, the Corps of Engineers acknowledges that this ISWTS is not effective at

times of heavy precipitation, which causes contamination to overtop the walls of the system and

discharge into Silver Stream and Moodna Creek.  The contamination migrating off the Facilities

will continue.

433.    The ISWTS for Rec Pond only treats outflows to the EPA Lifetime Health

Advisories of 70 ppt, which exceed the New York State MCL of 10 ppt, the legal standard to which

the Town of New Windsor is required to meet.

434.    The "provisional" Federal guidance level of 70 ppt is not protective and not

enforceable under the Clean Water Act, and it jeopardizes the health of the Town's residents.

435.    Moreover, upon information and belief, the first ISWTS built by DOD's contractors failed after two weeks of operation and had to be rebuilt later. It has deemed to be incapable of treatment in times of precipitation. In short, the ISWTW does not work when it rains; it overflows with contaminated in excess of even the 70 ppt levels, spilling over the impoundment, and into offsite waters, soils and groundwater.

436.    Upon information and belief, DOD has not undertaken a Feasibility Study to evaluate remedial alternatives. Such a study, properly done, will itself take years. Selection of an on-site remedy and its construction will take even longer.

437.    Upon information and belief, DOD has no intention of remediating "off-site" contamination caused by activities on the Base.

438.    To date, DOD has not even acknowledged PFAS contamination of the Town's drinking water supplies, let alone investigate and/or seek to remedy it.

439.    Upon information and belief, in 2016, NYSDEC and NYSDOH tested fish in downstream areas of the Base and Airport Property.

440.    As a result of that testing, NYSDEC and NYSDOH issued a "catch and release" advisory, effective July 24, 2017, to ensure that people do not consume PFAS-contaminated fish from the Watershed.

**THE STATE'S STATUTORY DUTY TO REMEDIATE THE CONTAMINATION**

441.    The New York State Constitution tasks the Legislature with, among other things, the duty:

> . . . to conserve and protect its natural resources and scenic beauty .
> . . The legislature, in implementing this policy, shall include adequate
> provision for the abatement of air and water pollution . . . ., and the
> development and regulation of water resources.

N.Y. Const. Art. XIV, § 4.

442.   The State has the *"sovereign duty to conserve and control its water resources . . ."*

in line with its public policy, which includes, among others:

> *Reasonable standards of purity and quality of the waters of the state*
> *be maintained consistent with public health, safety and welfare and*
> *the public enjoyment thereof, the propagation and protection of fish*
> *and wildlife, including birds, mammals and other terrestrial and*
> *aquatic life, and the industrial development of the state, and to that*
> *end, to require the use of all known available and reasonable*
> *methods to prevent and control pollution, wastage and unreasonable*
> *disturbance and defilement of the waters of the state.*

*ECL § 15-0105(7).*

443.   It is the declared public policy of the State *"to maintain reasonable standards of*
*purity of the waters of the state . . . and to that end . . . prevent and control the pollution of the*
*waters of the state of New York."* ECL §17-0101.

444.   Likewise, the Legislature has declared that the State, through its agencies, is *"to*
*safeguard the waters of the state from pollution by preventing any new pollution . . . ."* ECL §17-
0103.

445.   Further, the State, through its agencies, shall *"supervise and regulate the sanitary*
*aspects of water supplies . . . and control the pollution of waters of the state,"* and *"exercise control*
*over and supervise the abatement of nuisances affecting or likely to affect public health."* Public
Health Law ("PHL") §201(l), (n).

446.   In response to the discovery of PFAS contamination of Washington Lake, NYSDEC
immediately provided the City of Newburgh with major financial assistance, including the purchase
of all its replacement Catskill Aqueduct drinking water supplies; construction, and maintenance of
a permanent, full-sized Granular Activated Carbon ("GAC") treatment facility at the Washington

73

Lake Treatment Plant; and significant additional reimbursement for legal and technical expenses.

447.    Upon information and belief, the State continues to pay all the City's expenses, including the purchase of NYCDEP Catskill Aqueduct replacement water supplies and other costs related to contamination of Washington Lake.

448.    The Town has requested that NYSDEC construct a permanent, full-sized GAC filtration system at the Butterhill Wells site, just as it did for the City of Newburgh.

449.    To date, the State has failed to do so.   Instead, NYSDEC has provided only a temporary, partial GAC treatment unit that treats about 2.0 mgd, less than 32% of the Butterhill Wells rated capacity of 6.45 mgd.

450.    The State owns the groundwater as a natural resource, and it has a duty to remediate groundwater, especially groundwater that is used as drinking water.

451.    The State, as Owner and Operator of the Facilities, allowed the groundwater there to become contaminated, causing off-site contamination of the Watershed and the Town's drinking water supplies.

452.    As a direct result of the Butterhill Wells contamination and the Town's loss of its full production capacity, the Town has incurred costs, it otherwise would not have incurred, purchasing Catskill Aqueduct replacement water supplies from the New York City Department of Environmental Protection ("NYCDEP"), as well as incidental expenses related to operating the Riley Road Treatment Plant to treat this water.

453.    The Town has asked the State to pay the bills to purchase this water (which from May 2018 to October of 2020 was $1,635,000), as well for payment of future bills for same, just as the State did for the City of Newburgh. To date, the State has failed to do so.

454.    This disparate treatment has damaged the Town.

74

455.    Under New York State law, the Town relies upon the State for protection of waters, especially groundwater, which is a natural resource that belongs to the State.

456.    The State has failed to protect and restore groundwater, its natural resource, which sources the Butterhill Wells, the Town's primary drinking water supply.

457.    The United States has the legal duty to refrain from discharging pollutants into "Waters of the United States." Nonetheless, for decades, DOD's agents, employees and instrumentalities discharged PFAS into the environment at the Base, causing direct contaminant discharges into Silver Stream, Moodna Creek and the groundwater of the Moodna Watershed. These surfaces and groundwaters are "Waters of the United State" under the Clean Water Act.

458.    To date, the United States has refused to remediate the contaminants it discharged into those waters, including groundwater that sources the Town's drinking water supplies.

459.    The United States had a duty not to contaminate drinking water supplies.

460.    The United States, through DOD, breached that duty by negligently discharging PFAS contaminants at the Base and into the Watershed.

461.    DOD's negligent acts and omissions, described in greater detail above, were the proximate cause of the contamination of the Butterhill Wells.

462.    The Town has suffered damages as a result.

463.    The United States has refused to pay for the Town's damages.

464.    But for this contamination, the Town 1) could provide, on its own, for all its daily drinking water needs; 2) could produce enough to provide and/or sell to other municipalities in the region, and fulfill its intermunicipal agreement with the Town of Newburgh to supply it with drinking water during future shutdowns of the Delaware Aqueduct; 3) would not have to spend millions of taxpayer dollars buying Catskill Aqueduct water; 4) would not incur nearly the same

costs and expenses it now does, in order to operate and maintain the Riley Road Filtration Plant; 5) would not have to cope with failures of the Riley Road Plant caused by extreme turbidity; 6) would not have incurred additional costs and expenses related to securing an emergency backup supply of potable drinking water for the November 2019 shutdown of the Catskill Aqueduct; and 6) would not be burdened with approximately $19 mil. of bond debt, which it cannot now offset, as intended, with revenue generated from the sale of water sourced from the Butterhill Wells.

465.    The Town did not cause any of the contamination, either in its water supply wells or in the Watershed.

466.    The Town did not permit the trespass to its property, constituted by the presence of the Defendants' PFAS contaminants.

467.    The water sourcing the Butterhill Wells was tested before the wells were developed and brought into operation, and thus did not "move to the nuisance" caused by the Defendants' PFAS contamination.

468.    The Town seeks abatement of this public nuisance.

469.    Defendants are jointly and severally liable to the Town for its consequential and compensatory damages, and for its necessary costs of response pursuant to the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), and/or common law, equitable and constitutional theories.

470.    The United States is liable to the Town under the FTCA for all damages and losses attributable to the contamination of the water sourcing the Butterhill Wells.

471.    As of October 2020, the Town had incurred approximately $4,614,808 in damages directly attributable to the United States' negligence.

472.    The Town's costs and expenses related to the aforementioned contamination

76

continue to mount.

473.    To date, the United States has failed to reimburse the Town for any of the costs and expenses related to the contamination.

474.    The Town's damages include, but is not limited to, the lost value of the Butterhill Wells; resulting replacement water purchase costs; loss of profits from lost sales of Butterhill Wells water to other municipal users; bond repayment costs payable for development of the Butterhill Wells for any time that they do not produce as intended; and potential loss of real estate tax revenues as a result of tax grievances filed by the City of Newburgh, who claims that because its property, Lake Washington (which is in the Town of New Windsor) is contaminated, it has been rendered without value. The Town also seeks to recoup all legal and consulting costs necessary to defend these tax grievances, as well as all legal and consulting costs necessary to prosecute and defend all other actions linked to the contamination, including this action.

475.    Claims have been served on the Town by 102 area residents, future putative class action Plaintiffs who each intend to file $5,000,000 lawsuits against the Town, seeking damages against the Town as the supplier of water contaminated by Defendants, in New York State Supreme Court, Orange County.

476.    Therefore, the Town seeks equitable or implied indemnification and/or contribution for these claims served on the Town, and for any subsequent judicial actions filed against the Town in putative class actions.

477.    The Town seeks restitution from Defendants, who must be made to bear the Town's damages and costs caused by their negligent and/or reckless acts and omissions.

478.    The Town seeks recovery from Defendants for injuries, damages, and losses suffered by the Town as a result of Defendants' negligent and/or reckless acts and omissions,

77

including their negligent and/or reckless storage, use, discharge, disposal and/or manufacture of PFAS and negligent failure to warn of the dangers of same, all of which have proximately resulted in PFAS contamination of the soils, sediment, surface waters, and groundwater in and around the Watershed and the Town's drinking water supplies.

479.    Upon information and belief, as a result of Defendants' negligent and/or reckless acts and omissions, the Town has incurred the damages noted above and will incur future damages associated with increased costs for operation of the Town Water System, costs for alternative water supplies, remediation costs, lost profits from the sale of Butterhill Wells water to the Town of New Windsor Consolidated Water District and other municipalities, and other consequential damages.

480.    The Town seeks full remediation of its drinking water supplies, and cleanup of the contamination that is causing it.

### FIRST CAUSE OF ACTION AGAINST THE UNITED STATES, THE STATE, PANYNJ, NATIONAL EXPRESS, FEDEX, ATLANTIC AVIATION AND JOHN DOES 1-10 UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY ACT

481.    The Town repeats and realleges paragraphs 1 through 480 of this Complaint, as if set forth in this paragraph at length.

482.    The DOD, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 are "persons," as defined by Section 101(21) of CERCLA, 42 U.S.C. §9601(21).

483.    The Base and Airport Properties are "Facilities," as defined by CERCLA §101(9), 42 U.S.C. §9601(9).

484.    Some or all of the Hazardous Substances are designated "hazardous substances" under CERCLA §102(a), 42 U.S.C. §9602, and thus are "hazardous substances" under CERCLA §101(14), 42 U.S.C. §9601.

485.    The PFAS that contaminated the Facilities are "hazardous substances" under CERCLA §101(14), 42 U.S.C. 9601(14).

486.    The definition of "hazardous substances" under CERCLA §101(14), 42 U.S.C. §9601(14), includes "hazardous wastes" having the characteristics identified under RCRA §3001, 42 U.S.C. §6921.

487.    The PFAS that resulted in the contamination are "hazardous wastes" under the Resource Conservation and Recovery Act ("RCRA") §3001, 42 U.S.C. §6921.

488.    Specifically, the PFAS are hazardous wastes having one or more of the characteristics of persistence, bioaccumulation, biomagnification, ignitability, corrosivity and toxicity, as those characteristics are defined under RCRA §3001, 42 U.S.C. §6921.

489.    The United States, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 owned and/or operated the Base, the Airport, and/or NYSDOT Properties during a time period when the Hazardous Substances were released into the environment at those properties.

490.    Defendants are therefore "covered persons" liable under CERCLA §107(a)(2), 42 U.S.C. §9607(a)(2).

491.    The discharges of Hazardous Substances by the Defendants are "Releases" within the meaning of CERCLA §101(22), U.S.C. §9601(22), and have resulted in the contamination of Town Property, of sediment in the Watershed (including Silver Stream and Moodna Creek), and of sediment in Washington Lake.

492.    The DOD, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 are liable under CERCLA §107(a), 42 U.S.C. §9607(a), because they were owners and/or operators (or lessees) of the Facility who generated, discharged and disposed or arranged for the

disposal of Hazardous Substances at the Facilities.

493.    As a result of the Releases or threatened Releases of the Hazardous Substances, the Town has incurred and continues to incur "response" costs within the meaning of CERCLA §§101(23)-(25), 42 U.S.C. §§9601(23)-(25), including costs associated with the retention, through counsel, of an environmental consultant, and other response actions taken to reduce exposure to the Hazardous Substances.

494.    All such costs are necessary costs of response and, to the extent required, consistent with the National Contingency Plan.

495.    The Town will continue to incur such response costs in the future.

496.    The Town is entitled to full reimbursement from the United States, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 for all such response costs, pursuant to CERCLA §107(a), 42 U.S.C. §9607(a).

497.    The Town did not discharge or dispose of any wastes containing hazardous substances at the Facilities, and it did not release or contribute to the Defendants' releases of hazardous substances, which caused the contamination of Town Property and the Town's drinking water supplies.

498.    Accordingly, the United States, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 are strictly, jointly and severally liable under CERCLA §107(a), 42 U.S.C. §9607(a) for all response costs incurred by the Town.

## SECOND CAUSE OF ACTION AGAINST THE UNITED STATES, THE STATE, PANYNJ, NATIONAL EXPRESS, FEDEX, ATLANTIC AVIATION AND JOHN DOES 1-10 FOR NEGLIGENCE

499.    The Town repeats and realleges paragraphs 1 through 498 of this Complaint, as if

set forth in this paragraph at length.

500.    Under the Clean Water Act and Environmental Conservation Law ("ECL") Article 17, discharge of Hazardous Substances into the waters of the State of New York, including groundwater, or waters of the United States, is prohibited.    Discharges of all pollutants are prohibited unless they have been authorized by a State-issued SPDES Permit.

501.    Defendants did not have a SPDES Permit allowing for the discharge of PFAS, which New York has designated as hazardous substances, into the waters of the State of New, groundwater or into navigable waters.

502.    Defendants did not have permission from the Town to discharge AFFF containing hazardous substances into or onto Town Property.

503.    Pursuant to ECL §37-0107, "no person shall store or release to the environment substances hazardous or acutely hazardous to public health, safety or the environment in contravention of rules and regulations promulgated pursuant hereto."

504.    PFOA and PFOS are "Hazardous Substances" under New York State law.

505.    The United States through DOD, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 stored, used, released and disposed of AFFF containing Hazardous Substances into the environment.    These Hazardous Substances are hazardous or acutely hazardous to public health, safety or the environment, in contravention of applicable state laws and regulations, as defined in ECL §37-0107, including those that prohibit discharges of Hazardous Substances into the waters of New York.

506.    Silver Stream and Moodna Creek are waters of New York.

507.    The Defendants' violations of New York laws and regulations, especially those that prohibit discharges of Hazardous Substances into the waters of New York, and violation of SPDES

81

permits resulting in the contamination of Town Property, the Watershed, the Butterhill Wells and the Town's drinking water supplies, constitute negligence *per se*.

508.    Compliance with New York laws, SPDES permit regulations, as well as guidance documents, technical letters, and instruction manuals, including but not limited to SWPPPs, SPCC Plans and MSDSs, was mandatory for DOD, as well as the NYSDOT, NYANG, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10.

509.    The standard of care applicable to DOD, NYSDOT, NYSANG, National Express, FedEx, Atlantic Aviation and John Does 1-10 is defined, at least in part, by the numerous directives that required special handling and disposal of PFAS and other Hazardous Substances.

510.    The DOD, the State, National Express, FedEx, Atlantic Aviation and John Does 1-10 (including their officers, agents, servants, and/or employees) all owed and still owe a common law duty to the Town, and the public at large, to properly store, handle and legally dispose of Mil-Spec AFFF, and not to permit or allow it to contaminate the Facilities, the Watershed, the Town's drinking water supplies, and Town Property, and to prevent exposure of Town's residents and water customers to these Hazardous Substances contained in Mil-Spec AFFF.

511.    The DOD, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 (including their officers, agents, servants, and/or employees) also owed and still owe a duty to the Town and its residents and water customers to promptly and responsibly respond to these known releases of hazardous substances in a manner which would prevent exposure to the contamination, and otherwise protect the Town and its residents from the contamination and resulting impacts.

512.    The DOD, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 (including their officers, agents, servants, and/or employees) also owed and still owe a

duty to the Town to warn of discharges and contamination emanating from the Facilities into the Watershed and onto Town Property, including the Town's drinking water supplies and the Butterhill Wells.

513.    The DOD, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 (including their officers, agents, servants, and/or employees) owed and still owe a duty to all persons who might be harmed by their actions to exercise due care in the selection, use and disposal of Mil-Spec AFFF containing PFAS and other Hazardous Substances.

514.    The DOD, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 (including their officers, agents, servants, and/or employees) knew or should have known that the manner in which they were using, treating, storing, transporting, discharging and/or disposing of, or otherwise managing PFAS and other Hazardous Substances would result in the contamination of the surrounding environment, including the Watershed, Town Property and the Town's drinking water supplies.

515.    The DOD, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 (including their officers, agents, servants, and/or employees) knew or should have known that repeated disposals of Mil-Spec AFFF onto the ground, in soils, in surface waters, in drains and storm drains, and into Rec Pond would readily migrate into and contaminate the surrounding Watershed and downstream waterbodies, such as Silver Stream and Moodna Creek, and eventually the Town's groundwater drinking water supplies.

516.    The DOD, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 (including their officers, agents, servants, and/or employees) knew or should have known that exposure to PFAS and other Hazardous Substances was hazardous to the environment and to human health.

83

517.    The DOD, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 (including their officers, agents, servants, and/or employees) acted unreasonably and negligently and breached those duties by their negligent and reckless acts and omissions in owning, operating, maintaining, and controlling the Facilities; by failing to properly contain, and recklessly discharging and disposing of Mil-Spec AFFF at the Facilities and into the environment; and by failing to promptly respond, investigate and remediate the PFAS contamination they caused on Town Property, in the Watershed, and in the Town's drinking water supplies.

518.    The DOD and the State also breached their duty to timely warn the Town of the risk of contamination in the Moodna Creek, when, in 2016, they permitted closure of the Silver Stream Diversion Gate (cutting off Silver Stream's flow into Washington Lake), thereby ensuring that the PFAS-contaminated waters of Silver Stream would thereafter flow freely and un-diverted into Moodna Creek.  No one from the State advised the Town of this decision and action.

519.    Despite their extensive communications with the City of Newburgh about the closure of the Silver Stream Diversion Gate, and their express recognition that this action would likely cause contamination of the Moodna Creek, DOD and the State failed to advise or warn the Town.  The Town did not know about this action and would not have consented to it.

520.    As DOD and the State anticipated, closure of the Silver Stream Diversion Gate resulted in the unimpeded flow of hazardous substances from Silver Stream into the Moodna Creek, its groundwater, and the Butterhill Wells.

521.    DOD and the State negligently and recklessly breached their duty to warn the Town of this risk, and to date have failed to remediate the contamination of the Watershed, Town Property and the Town's drinking water supplies, which resulted from such dereliction of duty.  The Defendants have further failed to pay the Town's costs and expenses attributable to this dereliction

of duty, including, but not limited to, the purchase of replacement water supplies.

522.    These breaches of their duty have proximately caused substantial injury and damage to the Town, including, but not limited to, the foreseeable contamination of the Town's water supply, and the costs and damage that resulted from same.

523.    Accordingly, the United States, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 are jointly and severally liable to the Town for its damages proximately caused by their negligence and recklessness described above. Such damages include, but are not limited to, the loss of capacity the Town can draw from the Butterhill Wells; the costs and expenses associated with the investigation, cleanup, and remediation of the contamination; the costs and expenses associated with the prosecution of this matter, in an effort to recoup the costs and expenses of the investigation, cleanup and remediation; and the costs and expenses associated with the defense of claims brought against the Town as they relate to the contamination.

524.    Under the doctrine of *res ipsa loquitur*, the United States, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 are jointly and severally liable to the Town for their negligence and the Town's resulting damages.

525.    Before filing this action against the United States, the Town complied with the FTCA.

526.    Further, this Court should issue an injunction requiring the United States, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 to immediately investigate, remove all sources of Hazardous Substances and remediate the Base Property, the Airport Property, the Watershed and Town Property.

**THIRD CAUSE OF ACTION AGAINST
ALL DEFENDANTS FOR PUBLIC NUISANCE**

85

527.    The Town repeats and realleges paragraphs 1 through 526 of this Complaint, as if set forth in this paragraph at length.

528.    Under New York State law, contamination of public water supplies is a public nuisance.

529.    Defendants (including their officers, agents, servants, and/or employees), by causing the contamination, have interfered and continue to interfere with the rights common to all, including groundwater, surface waters (including the Town Watershed and Washington Lake), the Town Water System, and public lands.

530.    The Town, as owner of the Town Property cited above, and operator of the Town Water System, has sustained special damages from this public nuisance.

531.    The contamination interferes with the publics and the Town's use and/or enjoyment of Town Property, and the water in the Town Watershed and Washington Lake, in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

532.    Defendants knew or, in the exercise of reasonable care, should have known, that the use and failure to properly treat, store, transport, manage, discharge and/or dispose of Hazardous Substances would seriously and unreasonably interfere with the ordinary comfort, use and enjoyment of the Town Property, the Town Water System, and public lands.

533.    As a direct and proximate result of Defendants' creation of a public nuisance, by way of the contamination, the Town has suffered, and will continue to suffer, financial losses.

534.    Defendants are jointly and severally liable to the Town for these financial losses and all other damages that have been proximately caused by such public nuisance, including damages to the Town as a result of the contamination of the Town's Property and the Town's Water System. Such damages include, but are not limited to, costs and expenses for investigation, cleanup, and

removal of the contamination.

535.    The Manufacturer Defendants are not only jointly and severally liable for this public nuisance, along with the Federal Defendants, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10, but also, as the only manufacturers of AFFF meeting MIL-F-24385 specifications and/or supplying fluorochemical surfactant feedstocks used in MIL-F-24385, for their individual share of the market for such products.

536.    Further, this Court should issue an injunction requiring DOD, the State, the Manufacturer Defendants, PANYNJ, Afco Avports, National Express, FedEx, Atlantic Aviation and John Does 1-10 to immediately halt all sales of AFFF containing PFAS; halt their disposals; investigate and remove sources of the contamination; and remediate the Base Property, the Airport Property, and the Town's drinking water supplies.

### FOURTH CAUSE OF ACTION AGAINST THE UNITED STATES, THE STATE, THE MANUFACTURER DEFENDANTS, PANYNJ, NATIONAL EXPRESS, FEDEX, ATLANTIC AVIATION AND JOHN DOES 1-10 FOR TRESPASS

537.    The Town repeats and realleges paragraphs 1 through 526 of this Complaint, as if set forth in this paragraph at length.

538.    The DOD, the State, the Manufacturer Defendants, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10, by their intentional acts and omissions and/or the intentional acts and omissions of their officers, agents, and/or employees, knew or should have known that their actions and omissions would cause contamination to flow from the Facilities into the surrounding Watershed; or more specifically, from Rec Pond, into Silver Stream, into the Moodna Creek, and into the groundwater that supplies the Town's drinking water wells.

539.    The United States, the State, PANYNJ, National Express, FedEx, Atlantic Aviation,

John Does 1-10 and the Manufacturing Defendants used and failed to prevent the entry of Hazardous Substances into the groundwater, the Watershed, Town Property, and the Town Water System, with actual knowledge and/or substantial certainty that such Hazardous Substances would migrate into same.

540.    The continued migrations and existence of Hazardous Substances in Moodna Creek and the Town's drinking water supplies constitutes a continuing trespass.

541.    The DOD, the State, the Manufacturer Defendants, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 knew or should have known that Hazardous Substances would migrate to or otherwise enter the nearby groundwater, the Watershed, Town Property, and the Town Water System.

542.    The contamination was the inevitable result of those intentional acts and omissions.

543.    The DOD, the State, the Manufacturer Defendants, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 failed to prevent, remediate, or otherwise stop the contamination.

544.    The DOD, the State, the Manufacturer Defendants, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10, by their acts and omissions, or the acts or omissions of their agents, employees, or predecessors, have wrongfully interfered with the rights of the Town and the Town's exclusive possession of Town Property, and threaten to continue such wrongful interference into the future.

545.    By reason of this trespass, the DOD, the State, the Manufacturer Defendants, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 are jointly and severally liable to the Town for resulting damages they have proximately caused the Town, including, but not limited to, all costs and expenses related to the investigation, cleanup, and removal of the

contamination of the Watershed, Town Property, and the Town Water System.

546.    The Manufacturer Defendants are not only jointly and severally liable for this trespass with the other Defendants but given their role as manufacturers of AFFF products containing PFAS (and fluorochemical feedstocks) meeting MIL-F-24385 specifications, they are also liable in relation to their individual share of the market for such products.

547.    Further, this Court should issue an injunction requiring the United States, the State, PANYNJ, National Express, FedEx, Atlantic Aviation, John Does 1-10 and the Manufacturing Defendants to immediately investigate and remediate the Base Property, the Airport Property, and the Watershed, including, but not limited to, Rec Pond, Silver Stream, the Moodna Creek, and the groundwater sourcing the Town's drinking water wells.

## FIFTH CAUSE OF ACTION AGAINST THE UNITED STATES, THE STATE, PANYNJ, NATIONAL EXPRESS, FEDEX, ATLANTIC AVIATION AND JOHN DOES 1-10 FOR STRICT LIABILITY FOR ABNORMALLY DANGEROUS ACTIVITIES

548.    The Town repeats and realleges paragraphs 1 through 547 of this Complaint, as if set forth in this paragraph at length.

549.    The handling, use, storage, and disposal of hazardous substances and hazardous waste; leaving them in an un-remediated, unmonitored, unreported and unsecured condition; and allowing them to enter a public water supply is an abnormally dangerous activity.

550.    The United States, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 (including their officers, agents, servants, and/or employees) all engaged in abnormally dangerous activities by the manner in which they handled, used, stored, and disposed of hazardous substances and hazardous wastes at the Facilities, which: (a) created a high degree of risk of harm to others, particularly the Town, whose property has been adversely affected by the

89

contamination, and its residents and users of the municipal water supplies; (b) created an unreasonable risk of harm, given the likelihood of contamination of the water supplies surrounding the Facilities; (c) created an unreasonable risk of harm that could not be eliminated by reasonable care; (d) were not a matter of common usage; and (e) were inappropriate to the place that they were being carried on, in that the AFFF-containing wastes were not properly contained, and were allowed to flow into the sources of the Town's drinking water supplies, which imposed an unusual and extraordinary risk of harm to the Town and its residents.

551.    The risks posed by the abnormally dangerous conduct of these Defendants give rise to an absolute duty, owed to the Town, to avoid damage to it and its drinking water supplies.

552.    As a direct and proximate result of the conduct of the United States, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 in engaging in the abnormally dangerous activities alleged above, hazardous substances and hazardous wastes generated and stored at the Facilities have and continue to exist under and around the Airport Property and the Base Property, resulting in the off-site contamination of surface waters and groundwater, including the Watershed, Town Property and the Town's drinking water supplies.

553.    By reason of these abnormally dangerous activities, the United States, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 are jointly, severally and strictly liable to the Town for the damages caused by same.

554.    Further, this Court should issue an injunction requiring the United States, the State, PANYNJ, National Express, FedEx, Atlantic Aviation and John Does 1-10 to immediately investigate and remediate the Base Property, the Airport Property, the Town's Property, the sediment and waters of the Watershed (including Rec Pond and Silver Stream), and the waters sourcing the Town's drinking water supplies.

## SIXTH CAUSE OF ACTION AGAINST THE MANUFACTURER DEFENDANTS FOR STRICT PRODUCTS LIABILITY FOR DEFECTIVE DESIGN

555.    The Town repeats and realleges paragraphs 1 through 554 of this Complaint, as if set forth in this paragraph at length.

556.    Upon information and belief, AFFF meeting MIL-F-24385 specifications (which contained fluorochemical feedstocks) was only developed and manufactured by the Manufacturer Defendants.

557.    The Manufacturer Defendants also manufactured commercial grade AFFF.

558.    AFFF containing PFAS and their fluorosurfactant feedstocks, as designed and distributed by the Manufacturer Defendants, posed and continues to pose a substantial likelihood of harm resulting from exposure to the PFAS contained therein.

559.    The Manufacturer Defendants knew or should have known that exposure to PFAS and their AFFF products containing PFAS, and fluorochemical feedstocks contained therein, were hazardous to the environment and to human health.

560.    Use of the Manufacturer Defendants' AFFF products containing PFAS and fluorochemical feedstocks in the exact manner in which they were designed by the Manufacturer Defendants to be used, but without adequate warnings concerning the dangers of such use, posed a substantial likelihood of PFAS contamination in and around locations where they were used.

561.    Use of the Manufacturer Defendants' AFFF products containing PFAS and fluorochemical feedstocks in the exact manner in which they were designed by the Manufacturer Defendants to be used, but without adequate warnings concerning the dangers of such use, was the proximate cause of the PFAS contamination of the Facilities, the Watershed and the Town's

91

drinking water supplies in the matter at bar.

562.    The Manufacturer Defendants knew or should have known that the use of their AFFF products in the exact manner in which they were designed to be used, without adequate warnings concerning the dangers of such use, would result in PFAS contamination in and around locations where they were used, such as the Facilities, the Watershed and the Town's drinking water supplies at issue in this case.

563.    Knowing of the dangerous and hazardous properties of their products, the Manufacturer Defendants could have manufactured, marketed, and sold alternative designs or formulations of AFFF, which did not contain PFAS chemicals that are hazardous to health and the environment.

564.    Safer alternative designs of AFFF that prevent and/or significantly reduce the risk of harm to the environment and health of the general public - such as the risk of harm posed to the Town, its residents and users of its municipal water system, and the Town's immediate environment – and alternatives that could be used without impairing the reasonably anticipated or intended function of the product exist, and existed at the time the Manufacturer Defendants manufactured and distributed their AFFF products containing PFAS and fluorochemical feedstocks.

565.    These alternative designs and/or formulations were already available and/or are available, practical, and similar in cost.

566.    Safety design features that could have prevented and/or significantly reduced the risk of the Town's injuries, without impairing the reasonably anticipated or intended function of the product, exist and existed at the time the Manufacturer Defendants produced their AFFF products containing PFAS and fluorochemical feedstocks, and were economically and technologically feasible.

567.    The Manufacturer Defendants' products, used as intended, did in fact contaminate the Town's drinking water supplies.

568.    As a result of the Manufacturer Defendants' failure to redesign their AFFF products containing PFAS and fluorochemical feedstocks and provide adequate safety measures for same, the AFFF products used in this case were unreasonably dangerous and defective products.

569.    Products containing PFAS are dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

570.    As commercial manufacturers, the Manufacturer Defendants had a strict duty not to place an unreasonably dangerous product into the stream of commerce.

571.    The foreseeable risk of harm to the public health caused by the Manufacturer Defendants' AFFF containing PFAS and their fluorochemical feedstocks outweighed the cost to the Manufacturer Defendants of reducing or eliminating such risk.

572.    The AFFF was used in a reasonably foreseeable manner and without substantial change in the condition of the product.

573.    As a direct and proximate result of the Manufacturer Defendants' defective design of AFFF (including their fluorochemical feedstocks), the Town's drinking water supplies have been contaminated by PFAS, proximately resulting in the aforementioned damages to the Town.

574.    The acts and omissions of the Manufacturer Defendants were willful, wanton, reckless, and/or conducted with a reckless indifference to the rights of the Town and the rights and health of its residents.

575.    The Manufacturer Defendants are therefore liable for all of the damages caused to the Town, including damages to Town Property, to the Town's drinking water supplies, and for all costs and expenses associated with the investigation, removal and remediation of the contamination.

576.    The Manufacturer Defendants are strictly, jointly and severally liable for all such damages, and as the only manufacturers of AFFF meeting MIL-F-24385 specifications, the Manufacturer Defendants are liable for their individual share of the market for such products.

577.    Further, this Court should issue an injunction requiring the Manufacturer Defendants to immediately investigate and remediate the Base Property, the Airport Property, the Town Property, the sediment and waters within the Watershed, the sediment and waters of Rec Pond, Silver Stream, the Moodna Creek, and any sediment and waters that may influence the Town's Butterhill Wells.

## SEVENTH CAUSE OF ACTION AGAINST THE MANUFACTURER DEFENDANTS FOR STRICT PRODUCTS LIABILITY FOR FAILURE TO WARN

578.    The Town repeats and realleges paragraphs 1 through 577 of this Complaint, as if set forth in this paragraph at length.

579.    The AFFF, as designed and distributed by the Manufacturer Defendants, poses a substantial likelihood of harm resulting from exposure to PFAS contained therein.

580.    The Manufacturer Defendants knew or should have known that exposure to PFAS, and therefore exposure to their products, was hazardous to the environment and to human health.

581.    Use of the Manufacturer Defendants' AFFF products containing PFAS and fluorochemical feedstocks in the exact manner in which they were designed by the Manufacturer Defendants to be used, without adequate safety measures, poses a substantial likelihood of PFAS contamination in and around the areas in which they were used. Such use was and is the proximate cause of the PFAS contamination described at length above.

582.    Use of the Manufacturer Defendants' AFFF products containing PFAS and fluorochemical feedstocks in the exact manner in which they were designed by the Manufacturer

Defendants did in fact result the PFAS contamination complained of in this matter.

583.    The Manufacturer Defendants knew or should have known that the use of their AFFF products containing PFAS and fluorochemical feedstocks in the exact manner in which they were designed to be used would result in PFAS contamination in and around the areas in which they were used.

584.    Knowing of the dangerous and hazardous properties of their products, the Manufacturer Defendants had a duty to warn of the hazards associated with their products, including, but not limited to the contamination of environments in and around the areas where their products were used and, more specifically, the contamination of surrounding surface waters, groundwater and drinking water supplies.

585.    The Manufacturer Defendants' AFFF products containing PFAS, including their fluorochemical feedstocks, should not have been manufactured in their particular design at all, but having been manufactured, adequate instructions and warnings should have been provided with the products. They were not.

586.    Had the Manufacturer Defendants provided adequate instructions and warnings, measures could have been taken to avoid or decrease PFAS contamination and exposure to same.

587.    Had the Manufacturer Defendants provided adequate instructions and warnings, the users of AFFF at the Airport and the Base could have taken steps to reduce or prevent the release of PFAS into the environment.

588.    Adequate warnings could have included, but are not limited to:

      a)    A warning not to allow the AFFF to enter soils, sediment, groundwater, or waterways;

      b)    A warning to immediately collect AFFF upon use and provide for proper

disposal;

c)    A warning that, because the Manufacturer Defendants' AFFF contained constituents such as PFAS, which pose risks to human health and the environment, use of AFFF containing PFAS requires immediate containment and remediation after use in all scenarios.

589.    The Manufacturer Defendants' failure to provide adequate instructions and warnings for the AFFF they manufactured, marketed and sold, rendered the AFFF a defective product.

590.    Because their AFFF products and fluorochemical feedstocks were used exactly as designed, the harm resulting from their use was reasonably foreseeable, and thus proximately caused by the Manufacturer Defendants' actions or inaction.

591.    As a direct and proximate result of the Manufacturer Defendants' defective design of AFFF containing PFAS and their fluorochemical feedstocks, the Town's drinking water supplies have been contaminated by PFAS, proximately resulting in the damages more fully described above.

592.    The Manufacturer Defendants' acts were willful, wanton, reckless, and/or conducted with a reckless indifference to the rights of the Town and the rights and health of its residents.

593.    The Manufacturer Defendants are therefore liable for all of the damages to the Town proximately caused by such failure to warn, including, but not limited to the damages caused to the Watershed, the Town's Property, and the Town's drinking water supplies.  The Manufacturer Defendants should, thus, be held responsible for all costs and expenses related to the required investigation, cleanup, and removal of the contamination that resulted therefrom.

594.    The Manufacturer Defendants are strictly, jointly, and severally liable for all such damages and responsibility, and as the manufacturers of AFFF meeting MIL-F-24385

specifications (including those who manufactured fluorochemical feedstocks for same), the Manufacturer Defendants are liable for their individual share of the market for such products.

595.    Further, this Court should issue an injunction requiring the Manufacturer Defendants to immediately investigate, remove sources of the contamination, and remediate the Base Property, the Airport Property, the Watershed (including Rec Pond, Silver Stream, and the Moodna Creek), and the contaminated sediment and waters that influence the Town's drinking water supplies.

## EIGHTH CAUSE OF ACTION AGAINST THE
## MANUFACTURER DEFENDANTS FOR NEGLIGENCE

596.    The Town repeats and realleges paragraphs 1 through 595 of this Complaint, as if set forth in this paragraph at length.

597.    The Manufacturer Defendants knew or should have known that exposure to PFAS was hazardous to the environment and to human health.

598.    AFFF containing PFAS and their fluorochemical feedstocks, as designed and distributed by the Manufacturer Defendants, poses a substantial likelihood of harm resulting from exposure to the PFAS contained therein.

599.    The Manufacturer Defendants knew or should have known that exposure to PFAS, and therefore exposure to their products, was hazardous to the environment and to human health.

600.    Use of the Manufacturer Defendants' fluorochemical feedstocks and their AFFF products, in the exact manner in which they were designed by the Manufacturer Defendants to be used, poses a substantial likelihood of PFAS contamination in the areas in and around where they were used.

601.    Use of the Manufacturer Defendants' fluorochemical feedstocks and AFFF

products, in the exact manner in which they were designed by the Manufacturer Defendants, did in fact result in PFAS contamination in and around the areas where they were used, which in this instance resulted in PFAS contamination of the Town's drinking water supplies.

602.    The Manufacturer Defendants knew or should have known that the use of their AFFF products and their fluorochemical feedstocks, in the exact manner in which they were designed to be used, would result in PFAS contamination in and around the areas where they were used, which in this case resulted in PFAS contamination of the Town's drinking water supplies.

603.    The Manufacturer Defendants, including their officers, agents, servants, employees, and/or predecessors, owed a duty of care to the Town to design, market, label, and instruct users of their AFFF products and fluorochemical feedstocks to use and dispose of these products in a manner so as to prevent it from contaminating the surrounding environment and harming the public.

604.    As commercial manufacturers of AFFF containing PFAS and fluorochemical feedstocks, the Manufacturer Defendants owed a duty of care to the Town to not place into the stream of commerce a product that was defective and unreasonably dangerous.

605.    The Manufacturer Defendants also had a duty to warn of the hazards associated with their AFFF containing PFAS and fluorochemical feedstocks entering the environment and surrounding drinking water supplies.

606.    The Manufacturer Defendants, including their officers, agents, servants, employees, and/or predecessors acted unreasonably, negligently, and recklessly in manufacturing and designing their AFFF products containing PFAS and fluorochemical feedstocks, and in failing to warn the purchasers and users of these products' harmful properties and the safest way to use them.

607.    The Manufacturer Defendants breached their duties to the Town by negligently manufacturing and distributing such unreasonably dangerous products into the stream of commerce,

98

even when they knew or should have known about the dangers PFAS posed to human health and the environment.

608.    Because their AFFF products containing PFAS and fluorochemical feedstocks were used exactly as designed, the harm resulting from their use was reasonably foreseeable, and thus proximately caused by the Manufacturer Defendants' actions or inaction.

609.    The Manufacturer Defendants' production of their AFFF products containing PFAS and fluorochemical feedstocks, and their failure to warn regarding same, was a direct and proximate cause of the environmental damage and health impacts suffered by the Town in this case, as more fully described above.

610.    The Manufacturer Defendants are liable for all of the aforementioned damages sustained by the Town, which were proximately caused by the Manufacturer Defendants' negligence and recklessness, including, but not limited to, damages sustained to Town Property, to the Town's drinking water supplies, and all costs and expenses associated with the required investigation, cleanup, and removal of the contamination.

611.    The Manufacturer Defendants are strictly, jointly, and severally liable for all such damages and responsibility, and as the manufacturers of Mil-Spec AFFF products and their fluorochemical feedstocks, the Manufacturer Defendants are liable for their individual share of the market for such products.

612.    Further, this Court should issue an injunction requiring the Manufacturer Defendants to immediately investigate, remove sources of contamination, and remediate the Base Property, the Airport Property, and the Watershed (including Ree Pond, Silver Stream, and the Moodna Creek), and the Town's drinking water supplies.

## NINTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR EQUITABLE AND/OR IMPLIED INDEMNIFICATION

613.    The Town repeats and realleges paragraphs 1 through 612 of this Complaint, as if set forth in this paragraph at length.

614.    Defendants, including their officers, agents, servants, employees, and/or lessees, had a non-delegable duty to the Town and the public to prevent, clean up, or ensure against the contamination at issue, and to prevent the discharge of pollutants into the Watershed and into the Town's drinking water supplies.

615.    Because the Defendants breached this duty, they are responsible for all resulting costs and expenses and damages incurred by the Town, including, but not limited to, all costs and expenses incurred to date and into the future for the required investigation, remediation, and cleanup of the contamination.

616.    Further, the Defendants should, in equity, indemnify the Town for all expenses, costs, and damages related to the contamination at issue.

## TENTH CAUSE OF ACTION AGAINST
## ALL DEFENDANTS FOR RESTITUTION

617.    The Town repeats and realleges paragraphs 1 through 616 of this Complaint, as if set forth in this paragraph at length.

618.    It would be against equity and good conscience to permit the Defendants to pass the burden of cleaning up the contamination to the Town, and to have had the benefit and enjoyment of operations on the Base Property and the Airport Property, and/or manufacture and sale of AFFF, free of any responsibility for investigation, remediation, cleanup, and removal of, and response to, the contamination.

619.    Accordingly, Defendants should make restitution to the Town for all of its expenses,

costs, and damages related thereto, including all consulting and attorneys' fees.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Town requests a trial by jury on all counts so triable, and Judgment:

(1)    Granting Permanent Injunctions to abate the public nuisance, and imminent and substantial endangerment to health and the environment, as follows:

        a. Restraining Defendants from the use or storage of AFFF containing any form of PFAS at the Facilities;

        b. Directing Defendants to immediately abate, contain, and remediate ongoing disposals of all PFAS, including but not limited to PFOS and PFOA;

        c. Directing Defendants to immediately install or implement IRMs to prevent PFAS from entering the Watershed, including surface waters, groundwater, and sediments;

        d. Directing that all IRMs, final remedies and treatment of the Town's drinking water supplies produce a result of drinking water that contains non-detectible limits for all PFAS;

        e. Directing Defendants to pay all costs and expenses incurred by the Town to secure clean water from the Catskill Aqueduct and/or other sources, until all abatement, removal and remediation of Butterhill Wells is complete;

        f. Directing Defendants to pay for all independent consultants hired to assist the Town in undertaking independent analysis of all IRMs and remedial measures.

        g. Directing Defendants to pay for all interim remedial costs; and

(2)    Declaring all of NYSANG's and PANYNJ's SPDES permits null and void as a

violation of law for discharging Pollutants into a Class A waterbody; and prohibiting NYSANG and PANYNJ from obtaining new SPDES permits until a fluorine free AFFF is mandated for use at the Facilities:

(3)     To is implemented and an IRM is installed to prevent PFAS from entering the Watershed and the Town's drinking water supplies; and

(4)     Awarding all response costs incurred by the Town under CERCLA, including, but not limited to, costs of investigation, and declaring that Defendants are liable for all response costs to be incurred by the Town and others under CERCLA.

(5)     Awarding attorneys' fees and costs for the Town's defense against the 102 claims brought against the Town, arising out of the disposals of PFAS, and for all legal fees associated with the City of Newburgh's challenges to tax assessments of properties located in the Town of New Windsor.

(6)     Awarding all costs and disbursements associated with this litigation;

(7)     Directing Defendants to defend and indemnify the Town in any and all claims brought against the Town arising out of the disposals of PFAS, and any and all future claims against the Town resulting from the contamination at issue; and

(8)     Awarding the Town compensatory and consequential damages and other appropriate damages, in amounts to be determined by the evidence at trial and allowed by law, and attorneys' fees and costs, including pre-judgment and post-judgment interest.

(9)     Awarding punitive damages from the Manufacturer Defendants in an amount to be determined at trial;

(10)    Granting such further relief as the Court deems just and proper.

DATED:  May 3, 2021

/s/ Kimberlea Shaw Rea
**WESTERVELT & REA, LLP**
*Attorneys for Plaintiff*
Kimberlea Shaw Rea, Esq.  (KR 8384)
50 North Ferry Road
Post Office Box 633
Shelter Island, New York 11964
(631) 749-0200
kimberlearea@gmail.com